UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ADVANCED MAGNESIUM ALLOYS CORPORATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 1:20-cv-02247-RLY-MJD ) |
| ALAIN DERY, et al., | ) ) ) |
| Defendants. | ) |

**ORDER ON MOTION TO COMPEL**

This matter is before the Court on Plaintiff's Motion to Compel Discovery. [Dkt. 329.] For the reasons and to the extent set forth below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

**I. Factual Background**

The general factual allegations in Plaintiff's Second Amended Complaint, as relevant to the instant motion, are as follow. Plaintiff is in the business of magnesium recycling. Plaintiff alleges that while Defendant Alain Dery was serving as Vice President of Plaintiff, Dery conspired with Defendant Alliance Magnesium, Inc., ("Alliance") to "jump start" Alliance's entry into the magnesium recycling market. Plaintiff further alleges that Dery provided Plaintiff's confidential information and trade secrets to Alliance in furtherance of this conspiracy. Plaintiff asserts a variety of claims against Dery and Alliance. *See generally* [Dkt. 195].

## II. Discussion

Plaintiff raises two major issues in the instant motion, each of which is addressed, in turn, below.

### A. July 2019 Text Messages

One of the ways in which Plaintiff alleges that Dery assisted Alliance is in the recruitment of Marubeni Corporation, "a major multi-billion dollar international Japanese integrated trading and investment business conglomerate," to invest in Alliance. [Dkt. 195 at 15-16.] As part of Alliance's efforts to secure an investment from Marubeni, on July 26, 2019, Alliance CEO Michel Gagnon had a lunch meeting in Tokyo with Marubeni's President, Taichi Kuribayashi (hereinafter referred to as the "Tokyo Meeting").[1]

In response to Plaintiff's document requests, Alliance has produced certain text messages between Gagnon and Alliance's President, Joel Fournier, that were sent in July 2019. On July 16, 2019, Fournier texted Gagnon:[2] "Response from Dery," and then forwarded Gagnon a text message Fournier had received from Dery that said: "Good. I'll get back to you. Most likely would be Friday the 26th. Could it work that day?" [Dkt. 330-4.] On July 26, 2019, Fournier sent the following text to Gagnon: "Dery at noontime." [Dkt. 330-6.]

Plaintiff asserts that these "cryptic" messages

> show that Fournier and Gagnon were coordinating a noon meeting with Dery *at the same time* that Gagnon was meeting with Kuribayshi for lunch on July 26. What is missing, however, are all communications showing whether Dery participated, whether virtually or indirectly (though Fournier), in the July 26 meeting with Marubeni, whether Dery was helping prepare Gagnon for the

---

[1] The Tokyo meeting occurred at lunch time on July 26, 2019, Tokyo time, which would have been the evening of July 25, 2019, in Quebec, Canada, where Alliance is located.

[2] The text messages are actually in French; the Court accepts Plaintiff's English translations for purposes of this motion.

2

> meeting, and what, if anything, Dery contributed to these initial efforts to secure Marubeni's investment.

[Dkt. 332 at 7] (emphasis in original). Plaintiff questioned Gagnon and Dery in their depositions about any participation Dery may have had in the Tokyo Meeting or the preparation for it, but both testified that they did not recall. They also could not recall with any specificity what the text messages quoted above referred to. *See* [Dkt. 331-1 at 23-26, Dkt. 331-11 at 8-10.][3]

Plaintiff now moves to compel all text messages exchanged between Gagnon and Fournier in July 2019, hoping to give context to the text messages that were produced and determine whether the two exchanged any other text messages that would shed light on Dery's involvement in the Tokyo Meeting. There is no question that any text messages between Fournier and Gagnon that relate to any participation by Dery in the preparation for the Tokyo Meeting or in the meeting itself are responsive to Plaintiff's discovery requests.[4] Alliance does not really dispute that fact. Nonetheless, Alliance puts forth several reasons why Plaintiff's motion to compel should be denied with regard to the text messages.

First, Alliance argues that Plaintiff's request "is not proportional to the discovery needs in this case and is nothing more than a fishing expedition to attempt to get around the established fact that Dery was not at or involved in" the Tokyo Meeting. [Dkt. 362 at 6.] However, the evidence pointed to by Alliance does not support its assertion that the extensive discovery already completed in this case "has clearly established that Dery had no role in Alliance's July

---

[3] Dery testified that he had dinner with Fournier in Montreal the evening of July 26, 2019. When asked if he met with Fournier at noon on that day, he answered "[i]t's possible, but I'm not certain." [Dkt. 330-11 at 9.] The Court notes that Japan is thirteen hours ahead of Montreal, so by noon on July 26 in Montreal, the Tokyo Meeting was long over.
[4] For example, Plaintiff's Request No. 5 requests "[f]or the time period from January 1, 2018[,] to present, all Documents and Communications relating to Dery." [Dkt. 330-7 at 5.]

3

2019 meeting with Marubeni in Japan. . . . Dery did not call into or otherwise participate in the meeting." *Id.* at 7.  In fact, Gagnon testified only that he **had no recollection** of Dery calling in to the Tokyo Meeting.  *See id.* at 8 (quoting Gagnon's deposition testimony).  Dery, too, testified only that he **had no recollection** of "having any kind of referring with Marubeni people or with Michel Gagnon while he was in Japan"; he also testified that he had dinner with Fournier in Montreal while Gagnon was in Japan and that he found out during that dinner that Gagnon was in Japan at that time.  *See id.* at 8-9 (quoting Dery's deposition testimony).  Again, this testimony does not foreclose the possibility that Dery's input was solicited in preparation for the Tokyo Meeting.  Not recalling involvement in a meeting is a very far cry from denying involvement in a meeting.  It might certainly be the case that Dery had no involvement in the Tokyo Meeting in any capacity and/or that there are no text messages that refer to any such involvement, but Plaintiff's desire to know whether that is the case cannot be characterized as a baseless fishing expedition.

Next, Alliance correctly notes that Plaintiff does not only seek text messages that relate to Dery's participation in the preparation for the Tokyo Meeting or in the meeting itself.  Rather, Plaintiff seeks an order compelling **all** text messages between Fournier and Gagnon during the month of July 2019.  The Court agrees that this request is overbroad, as it undoubtedly encompasses text messages that are not responsive to Plaintiff's discovery requests (and which are wholly irrelevant to this case).

Finally, Alliance argues that it does not have to produce **any** further text messages because it fulfilled its obligation to respond to the relevant document requests by producing the documents found by searching for the 159 search terms agreed to by the parties.  If Plaintiff

wants additional text messages that do not contain any of the agreed-upon search terms, Alliance argues, Plaintiff must tender a new document request seeking those text messages.

Using negotiated search terms as a way of finding documents that are responsive to broad document requests among a vast number of electronic documents is, in fact, an agreement that those searches will fulfill the producing party's obligation with regard to those document requests. As Plaintiff correctly points out, however, the process is far from perfect.

> To assist in producing responsive electronically stored information, parties frequently use keyword searches. Keyword searches "have long been recognized as appropriate and helpful for ESI search and retrieval," but "there are well-known limitations and risks associated with them." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 260 (D. Md. 2008). "Chief among [those limitations] is that such a search necessarily results in false positives (irrelevant documents flagged because they contain a search term) and false negatives (relevant documents *not* flagged since they do not contain a search term)." *Makowski v. SmithAmundsen LLC*, No. 08-C-6912, 2012 WL 1634832, at *1 (N.D. Ill. May 9, 2012). As a result, "[e]lectronic discovery requires cooperation between opposing counsel and transparency in all aspects of preservation and production of ESI." *William A. Gross Constr. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009).

*Venturedyne, Ltd. v. Carbonyx, Inc.*, 2016 WL 6694946, at *1 (N.D. Ind. Nov. 15, 2016). Part of that cooperation includes agreeing to search additional keywords when the need to do so becomes apparent—when, for example, it is learned that Dery is sometimes referred to as "Mr. X" in relevant documents.[5] Part of that cooperation also includes agreeing to search for and

---

[5] Plaintiff argues that one reason false negatives are likely in this case is that "Alliance's top executives conducted themselves in a deliberately obfuscating manner in its internal communications, using code names for Dery and ordering that communications to Dery be routed through third parties in an attempt to avoid detection," and complains that "[t]ellingly, Alliance did not offer to use Dery's code names of 'Mister X,' 'Alain X,' 'Mr. X,' 'Monsieur X,' 'M. X,' or Dery's initials as search terms when it proposed search terms for responsive ESI in this case." [Dkt. 374 at 6 n.1.] However, the Court notes that "Dery" itself is not among the 159 search terms on the list provided to the Court. *See* [Dkt. 360-1]. Indeed, it is not clear to the Court how the text messages that were produced were found using the search terms, as they do

produce certain relevant and responsive documents that, for whatever reason, would not be revealed by keyword searches.

Such is the situation here.  If there are any additional text messages between Gagnon and Fournier that relate to the Tokyo Meeting, including any role Dery played in preparing for, participating in, or reacting to that meeting, Plaintiff is entitled to those documents.  In a perfect world, Alliance would have acceded to Plaintiff's request during Gagnon's deposition that it produce the entire "text string" between Gagnon and Fournier.  *See* [Dkt. 355 at 7-8].  Absent such an agreement, in a slightly less-than-ideal world, Plaintiff would have tendered a narrowly tailored discovery request to obtain any additional relevant text messages and Alliance would have responded to that request without objection.

As is so often the case in litigation, however, we find ourselves in a world that is far from ideal.  Alliance refused the reasonable request Plaintiff made at the deposition.  Plaintiff has now moved to compel the production of **all** text messages between Gagnon and Fournier for the month of July 2019, without explaining why such a broad order would be appropriate.  The Court is left to fashion a resolution to this dispute that would have been far more efficiently resolved by cooperation between counsel.

"District court judges are accorded broad discretion in discovery matters." *Fields v. City of Chicago*, 981 F.3d 534, 550-51 (7th Cir. 2020).  The Court, in its discretion, orders as follows: **By August 21, 2022,** counsel for Alliance shall review all text messages between Gagnon and Fournier during the month of July 2019 and shall produce them, but may redact any message or

---

not appear to contain any of the 159 search terms.  The Court can only assume that Dery's name was also searched for by Alliance and the parties simply neglected to include that fact in their briefs.

portion thereof that falls into one of the following categories: (1) communications that are purely personal in nature[6]; or (2) communications that clearly and unequivocally relate to business matters other than those at issue in this case. An attorney of record for Alliance shall file a certification that he or she has personally reviewed all of the text messages and attests that all redactions unambiguously fall into one of the two categories set forth above. To be clear, even if an entire text message is properly redacted, it shall nonetheless be produced in its redacted form to permit Plaintiff to trace the various text conversations that occurred. In addition, at the time of production, Alliance shall also provide Magistrate Judge Dinsmore for *in camera* review a complete copy of the redacted text messages produced pursuant to this order, as well as a complete unredacted copy of those same messages, so that the Court can confirm compliance with this order.

**B. Attorneys' Eyes Only Designations**

The second issue raised by Plaintiff does not require much discussion. Plaintiff believes that Alliance has abused the Attorneys' Eyes Only ("AEO") designation permitted by the protective order entered in this case. Plaintiff notes that Alliance has designated 13,060 documents as AEO, and argues that "[s]uch a large number alone demonstrates abuse of the AEO designation process." [Dkt. 332 at 12] (citing *THK America, Inc. v. NSK Co.*, 157 F.R.D. 637, 650 (N.D. Ill. 1993)). Therefore, Plaintiff asks the Court to "order Alliance to remove its AEO designations from all documents and give Alliance a short period to relabel them in good

---

[6] Plaintiff asserts that "it is hard to imagine what intimate matters these two executives would be texting each other about," [Dkt. 374 at 3], but anyone who has conducted an extensive document review knows that is not true. Co-workers often communicate about purely personal matters; for example, one might inquire about the illness of the other's family member before discussing a business matter.

7

faith on a specific document by document basis with an upper limit of a finite amount to be determined by the Court." *Id.* (citing *See Procaps S.A. v. Patheon Inc.*, 2015 WL 4430955, at *9 (S.D. Fla. July 20, 2015); *In re ULLICO Inc. Litig.*, 237 F.R.D. 314, 318 (D.D.C. 2006)).

      The Court rejects this approach. Whether AEO designations are appropriate must be determined on a document-by-document basis; the Court simply cannot establish a percentage or absolute number of AEO designations that are appropriate in this case in a vacuum. Other than pointing to the large number of designations, Plaintiff has not even attempted to demonstrate that any particular designation is inappropriate, beyond five documents Plaintiff identifies in its brief as examples.[7] It is certainly not surprising that Alliance's AEO designations are less than perfect; that is why the protective order provides a mechanism for challenging them. *See* [Dkt. 56 at 4]. And if Alliance has abused the AEO designation process by improperly designating a large number of documents without a reasonable basis for believing the designations were appropriate, then Alliance will be subject to sanctions, perhaps including the elimination of the AEO designation. But Plaintiff cannot demonstrate that to be the case by simply pointing to the number of AEO designations Alliance has made.

      If Plaintiff wishes to challenge Alliance's AEO designations, Plaintiff must identify the specific documents Plaintiff believes Alliance should de-designate. If Alliance refuses to de-designate some or all of the identified documents, Plaintiff may then file a motion raising the issue. The Court will then conduct an *in camera* review of the identified documents and make a

---

[7] Alliance has subsequently de-designated each of the five identified documents. [Dkt. 362 at 18.] Alliance also de-designated the vast majority of a set of 550 documents previously identified by Plaintiff. [Dkt. 360-5.]

ruling as to each one.  In the event such a motion is filed, Alliance will have the burden of justifying each challenged AEO designation.

### III. Conclusion

For the reasons set forth above, Plaintiff's Motion to Compel Discovery, [Dkt. 329], is **GRANTED** to the extent that Alliance shall produce the July 2019 text messages as set forth above and **DENIED** in all other respects.  Neither party is entitled to fees as a result of this Order.

SO ORDERED.

Dated:  5 AUG 2022

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.