UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ADVANCED MAGNESIUM ALLOYS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02247-RLY-MJD |
| | ) | |
| ALAIN DERY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION REGARDING PLAINTIFF'S RENEWED MOTION TO HOLD ALL DEFENDANTS AND ALLIANCE PRINCIPALS MICHEL GAGNON AND JOEL FOURNIER IN CONTEMPT OF COURT**

This matter is before the Court on Plaintiff's renewed motion seeking to hold each of the Defendants, along with non-parties Joel Fournier and Michel Gagnon, in contempt of court. [Dkt. 443.] On May 30, 2023, District Judge Richard L. Young designated the undersigned Magistrate Judge to issue a report and recommendation regarding the disposition of the motion pursuant to 28 U.S.C. § 636(b)(1)(B). [Dkt. 687.] The Undersigned held an evidentiary hearing on the motion on July 12, 2023, July 13, 2023, July 14, 2023, and July 31, 2023, and heard the parties' closing arguments on August 3, 2023. Having considered the evidence and arguments presented at the hearing, as well as the parties' briefs, the Undersigned **RECOMMENDS** the following.

## I. Background

This case was filed on August 27, 2020. In a nutshell, Plaintiff Advanced Magnesium Alloys Corporation, d/b/a AMACOR ("AMACOR"), alleged that while Defendant Alain Dery was employed as AMACOR's Vice President of Sales and Marketing, Dery conspired with

Defendant Alliance Magnesium Inc., now d/b/a Tergeo Critical Minerals Inc.[1] (hereinafter referred to as "Alliance/Tergeo") to "jump start" Alliance/Tergeo's entry into the market for magnesium recycling using AMACOR's confidential information and trade secrets.

Along with the Complaint, AMACOR filed a Motion for Temporary Restraining Order and Preliminary Injunction.  [Dkt. 6.]  On September 4, 2020, Judge Young entered the parties' Agreed Standstill Order, which mooted the motion for temporary restraining order.  [Dkt. 28.] The Agreed Standstill Order provided, in relevant part:

> 1. Dery and Alliance, and each of them, and those acting in concert or participation with them, are hereby temporarily enjoined and restrained from participating, directly or indirectly, or assisting any third party, directly or indirectly, in the manufacture, sale, solicitation of orders, acceptance of business, or negotiation of contracts for potential sales of recycled magnesium.  Nothing herein; (a) prohibits Alliance from building a processing facility, so long as it does not manufacture, sell, solicit orders, accept business, or negotiate contracts for potential sales of recycled magnesium during the term of this Agreed Order; and (b) prohibits Alliance from engaging in the primary magnesium market and any other market. However, Dery is prohibited from working in any capacity for Alliance or in the magnesium industry during the term of this Order; provided that nothing in this Order prohibits Dery from engaging in businesses involving other chemical elements, materials or substances.

> 2. Dery and Alliance, and each of them, and those acting in concert or participation with them, are hereby temporarily enjoined and restrained from using or disclosing trade secrets or confidential information of AMACOR's that is in their possession, custody, or control, including weekly reports on calls to customers; sales agreements showing price quantity, location and products being offered and sold; customer-provided product specifications; customer visit reports; RFQs; cost evaluation tools; information regarding scrap pricing with suppliers; and furnace and plant technology information.  Nothing herein shall constitute or be construed as an admission or acknowledgment that Dery and Alliance are in possession of any such information or that such information listed above is confidential information or trade secrets of AMACOR's.

_____

[1] The Undersigned notes that its Order at Docket 726 failed to precisely identify the relevant corporate entities.  **The Clerk is directed to amend the docket to change the name of Defendant Alliance to read as follows:  "Alliance Magnesium Inc., now d/b/a Tergeo Critical Minerals Inc."**

*Id.*  The Agreed Standstill Order further provided that it would remain in effect until the earlier

of December 31, 2020, or a ruling on the motion for preliminary injunction.  *Id.*

On October 27, 2020, the parties entered into an Agreed Injunction that mooted the

motion for preliminary injunction.  [Dkt. 59.]  The Agreed Injunction provided, in relevant part:

> 1. Alliance and those acting in concert or participation with it are hereby enjoined
> and restrained from (i) participating, directly or indirectly, or assisting any third
> party, directly or indirectly, in the manufacture, sale, solicitation of orders,
> acceptance of business, or negotiation of contracts for potential sales of recycled
> magnesium through December 31, 2020, and (ii) employing or using the services
> of Dery, whether directly or indirectly, through trial in this matter.  Nothing herein:
> (a) prohibits Alliance from building a processing facility, so long as it does not
> manufacture, sell, solicit orders, accept business, or negotiate contracts for potential
> sales of recycled magnesium through December 31, 2020; and (b) prohibits
> Alliance from engaging in the primary magnesium market and any other market.
>
> 2. Through June 8, 2022, Dery is enjoined and restrained from working in any
> capacity in the magnesium industry; provided that nothing in this Order prohibits
> Dery from engaging in businesses involving other chemical elements, materials or
> substances.

*Id.*[2]  The Agreed Injunction further provided that it superseded the Agreed Stand Still Order.  *Id.*

The Agreed Stand Still Order and the Agreed Injunction will be referred to hereinafter as "the

Orders."

## II.  Applicable Law

In the instant motion, AMACOR alleges that Defendants Alliance/Tergeo, Dery, and

Wogen Resources America LLC ("Wogen"), and non-parties Joel Fournier and Michel Gagnon

---

[2] In his response to the instant motion, Dery makes much of the fact that he did not agree to, and
is not the subject of, Paragraph 1 of the injunction.  *See* [Dkt. 507 at 15].  However, any work
that Dery performed for the benefit of Alliance/Tergeo would necessarily have violated
Paragraph 2 of the injunction, as Alliance/Tergeo's only business was in the magnesium industry.

all violated the Agreed Stand Still Order and the Agreed Injunction and therefore should be held in contempt of court. With regard to civil contempt,[3] to prevail on its motion, AMACOR must establish by clear and convincing evidence[4] that

> (1) the [Agreed Stand Still Order and/or the Agreed Injunction] set forth an unambiguous command; (2) [the Defendant/Non-Party in question] violated that command; (3) the violation was significant, meaning that [the Defendant/Non-Party in question] did not substantially comply with the order; and (4) [the Defendant/Non-Party in question] failed to make a reasonable and diligent effort to comply.

*Ohr ex rel. Nat'l Lab. Rels. Bd. v. Latino Exp., Inc.*, 776 F.3d 469, 474 (7th Cir. 2015) (citing

*U.S.S.E.C. v. Hyatt,* 621 F.3d 687, 692 (7th Cir. 2010)).

---

[3] AMACOR argues in its motion that both civil and criminal contempt findings are warranted. The Undersigned may only recommend the resolution of the question of civil contempt herein. With regard to criminal contempt, the Undersigned may only determine whether a recommendation for a referral for criminal contempt proceedings is appropriate. *See Lightspeed Media Corp. v. Smith*, 830 F.3d 500, 508 (7th Cir. 2016) ("[C]ivil contempt may be imposed if proven by clear and convincing evidence, and without the full criminal procedural process . . . while criminal contempt may be imposed only after the subject of the contempt proceeding has 'been afforded the protections that the Constitution requires of such criminal proceedings.'" (quoting *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 632) (additional citations omitted)); *S.E.C. v. First Choice Mgmt. Servs., Inc.*, 678 F.3d 538, 544 (7th Cir. 2012) ("In cases of contempt involving violation of an order . . ., the judge must among other things appoint a lawyer (normally the U.S. Attorney . . . to prosecute a charge of criminal contempt. Fed. R. Crim. P. 42(a)(2). And the contemnor cannot be punished with a jail sentence of six months or more unless he is convicted by a jury.") (additional citations omitted).

[4] AMACOR notes in its brief that "the Seventh Circuit has questioned whether the appropriate standard is preponderance of the evidence in light of the Supreme Court's insistence on a presumption in favor of that less onerous standard in federal civil cases." [Dkt. 462-1 at 46] (citing *First Choice Mgmt. Servs., 678 F.3d at 544*). The *dicta* cited by AMACOR notwithstanding, the Seventh Circuit has consistently acknowledged that the clear and convincing evidence standard applies to civil contempt motions. *See, e.g.*, *Houlihan v. City of Chicago*, 871 F.3d 540, 549 (7th Cir. 2017); *Lightspeed Media Corp.*, 830 F.3d at 508; *Domanus v. Lewicki*, 742 F.3d 290, 296 (7th Cir. 2014).

### III.  Findings and Conclusions Regarding Alliance/Tergeo, Gagnon, Fournier, and Dery

The evidence presented at the hearing relevant to the contempt allegations against Alliance/Tergeo, Gagnon, Fournier, and Dery can be divided into two broad categories:  (1) evidence regarding Dery's continued work for the benefit of Alliance/Tergeo under the guise of working for Power Up China; and (2) evidence that Alliance/Tergeo solicited sales during the injunction period. The evidence relevant to each category is set forth below.[5]

As background, the Undersigned notes that Alliance/Tergeo's ultimate business plan was to enter the primary magnesium market.  [Dkt. 702 at 128.]  However, it first entered the secondary, or recycled, magnesium market, to earn revenue while it pursued funding for its primary magnesium production facility and because there are technical reasons to begin with secondary magnesium production before beginning production of primary magnesium.  *Id.* at 127-28.  To date, Alliance/Tergeo has only entered the secondary magnesium market.  *Id.* at 13. It is still working to raise the capital needed for a primary magnesium production facility.

The secondary magnesium market involves acquiring magnesium scrap and then processing that scrap into ingots, which are used for various manufacturing purposes.  *Id.* Alliance/Tergeo began receiving deliveries of magnesium scrap in the third quarter of 2020.  *Id.* at 130.  AMACOR and Alliance/Tergeo are competitors in the secondary magnesium market.

---

[5] The Undersigned finds that AMACOR has not satisfied its burden of proof with regard to its allegation that Dery violated the Agreed Injunction in the course of his work for Heneken, which began in May 2022.  There is not clear and convincing evidence that Dery's work for Heneken prior to the expiration of the Agreed Injunction on June 8, 2022, included magnesium; the emails pointed to by AMACOR on which Dery was copied do not prove that Dery had any involvement in Heneken's sales to Alliance or that he was otherwise involved in Heneken's magnesium business.

### A.  Dery's Continued Work for Alliance Through Power Up China

#### 1.  Dery's Employment Agreement with Alliance/Tergeo

On March 1, 2020, an employment agreement ("Alliance/Tergeo Agreement") was

executed by Dery, Fournier (as President of Alliance/Tergeo), and Gagnon (as CEO and

Chairman of the Board of Alliance/Tergeo) in which Dery agreed to serve as Alliance/Tergeo's

Vice-President of Business Development.  Exhibit 2A.[6]  The Alliance/Tergeo Agreement

provided that Dery's employment with Alliance/Tergeo would begin "at most two months

following the closing of financing estimated on March 1, 2020," and that "[a]t that time, this

Agreement will take effect."  Exhibit 2A at ¶ 2.1.  Alliance/Tergeo agreed to pay Dery a base

salary of $275,000.00 (CAD) per year, Exhibit 2A at ¶ 4.1, which was approximately

$219,285.00 in US dollars, or approximately $18,000.00 USD per month.  [Dkt. 702 at 138.]

The Alliance/Tergeo Agreement further provided that Dery would receive 800,000 Class A

Alliance/Tergeo share options immediately upon its execution and additional share options in

subsequent years if he remained employed by Alliance/Tergeo.  Exhibit 2A at ¶ 7.1.  Dery's role

at Alliance/Tergeo included serving as a "scrap procurement expert" for Alliance/Tergeo's

anticipated recycled magnesium business.  [Dkt. 702 at 134-35.]  Dery had knowledge regarding

magnesium scrap procurement from his work at AMACOR.  [Dkt. 704 at 14-15.]

#### 2.  Dery's Termination from AMACOR

At the time the Alliance/Tergeo Agreement was executed, Dery was still employed by

AMACOR as a vice president.  AMACOR terminated Dery's employment on June 8, 2020, after

---

[6] All citations to exhibits herein are to exhibits that were admitted into evidence during the evidentiary hearing.  Many of the relevant documents in this case are in French; the citations herein are to the certified English translations of the French documents.

learning that he had been assisting Alliance/Tergeo.  Exhibit 7.  That same day, AMACOR's

counsel sent a letter to Gagnon and Fournier at Alliance/Tergeo, informing them of Dery's

termination and AMACOR's reasons for it, which were that a forensic examination of Dery's

work computer

> found alarming evidence going back to last summer that [Dery] in fact had been
> actively providing consulting services to Alliance, using AMACOR knowhow in
> responding to inquiries from various Alliance high-level personnel, including both
> of you personally, in regard to setting up a competing enterprise in AMACOR's
> magnesium recycling niche.  This included, for example, sharing with Alliance very
> sensitive pricing information relating to the purchase of magnesium scrap and
> responding to other requests, such as a financial model that Alliance could use. All
> of foregoing constitutes smoking gun evidence that Mr. Dery was double dealing,
> ostensibly running AMACOR's sales and marketing operations while at the same
> time assisting Alliance—with Alliance's active connivance—in formulating and
> developing its plans for expansion into the secondary magnesium recycling market
> until presumably Alliance reached the stage where it was ready to hire him so that
> he could assist in further implementing his wealth of knowledge about AMACOR's
> trade secrets for his and Alliance's benefit.

Exhibit 4 at 1-2 (hereinafter referred to as the "AMACOR Letter").  The AMACOR Letter

further advised Alliance/Tergeo to "immediately take all steps necessary to identify, retain, and

preserve all data in your possession or under your control, including electronic data, that pertains

[to] the matters referenced in this letter."  *Id.* at 3.

The following day, AMACOR's counsel sent a letter to Dery, memorializing the

circumstances of Dery's termination and similarly advising Dery to preserve all information "that

pertains to [AMACOR] or your dealings with Alliance."  Exhibit 7 (hereinafter referred to as the

"Termination Letter").  The Termination Letter elaborated as follows:

> To be clear, such data includes not only paper copies, but also emails, text
> messages, social media posts and other electronic documents, as well as backed-
> up, deleted, hidden, or orphaned data.  It also includes storage media (e.g., USB
> external storage devices, disks and backup tapes); all word-processed files,
> including drafts and revisions and metadata; all spreadsheets, including drafts and

revisions; all databases; all data generated by calendaring, task management and Personal Information Management software (such as Microsoft Outlook Notes); and all data created with the use of I-Phones or similar devices. **Failure to do so in light of this advisory may constitute spoliation of evidence or have other adverse consequences for you.**

You must act quickly to preserve this information. The continued operation of computer systems may overwrite data resident on servers and hard drives, including discoverable data that is invisible to the operating system. Thus, all relevant data must be safeguarded from destruction for any reason, including but not limited to backup, restoration, deletion, destruction, and recycling.

*Id.* at 2 (emphasis in original). The AMACOR Letter to Alliance/Tergeo contained virtually identical language. Exhibit 4 at 3.

### 3. Jean Deragon

Gagnon has known Jean Deragon in a professional capacity for more than twenty years. [Dkt. 702 at 128.] Gagnon was aware that Deragon owned a refractory company that manufactured bricks. *Id.* Deragon also owned a company called Power Up China, which Gagnon understood to be a logistics company. *Id.* at 129. Gagnon was not aware of Deragon or Power Up China having any experience in the magnesium industry. *Id.* Similarly, Ed Hopkins from Wogen testified that he had worked in the magnesium industry for three decades and had never heard of Power Up China or Deragon in the context of that industry. *Id.* at 32-33.

While Gagnon testified that he believed Power Up China had over a thousand employees, Gagnon never interacted with anyone from Power Up China other than Deragon. *Id.* at 131. In fact, Gagnon had only heard the name of one other Power Up China employee, "but it was Chinese and [he] didn't remember it." *Id.* Gagnon testified that he only dealt with Deragon

because he spoke French and Power Up China's other employees spoke Chinese.  [Dkt. 703 at 76.][7]

As of June 2020, Deragon was working with Alliance/Tergeo to source equipment for the magnesium recycling plant Alliance/Tergeo was building, primarily from China.  [Dkt. 702 at 140.]

### 4. Dery's Work for Alliance/Tergeo Through Power Up China

Alliance/Tergeo's counsel responded to the AMACOR Letter on June 12, 2020, and stated, in relevant part:

> Amacor should rest assured that Mr. Dery is not working for nor associated with Alliance.  There will be no collaboration between our client and Mr. Dery until this matter has been duly investigated.  Moreover, Alliance will cancel the previous employment offer and we will advise you prior to making Mr. Dery any further offers of this nature.

Exhibit 10 at 2.  However, based on the following evidence, the Undersigned finds that Alliance/Tergeo, through Gagnon and Fournier,[8] thereafter implemented a plan by which Dery would continue assisting Alliance/Tergeo without directly working for Alliance/Tergeo.

On July 22, 2020, Gagnon, Fournier, and Dery had dinner with Deragon.  [Dkt. 702 at 152.]  At that dinner, they discussed a plan pursuant to which Alliance/Tergeo would pay Power Up China $18,000.00 per month, plus a 3.5 percent administrative fee ($630.00) and the

---

[7] AMACOR suggests that perhaps Power Up China had only one employee.  The Undersigned need not make any finding on that issue, but does note that it is highly unlikely that a company with more than a thousand employees whose stated purpose is to interface between North America and China would only have one employee who spoke English or French.  However, it is not unusual for the members of a conspiracy to limit the number of people who are aware of and involved in it.

[8] There is no dispute that, by virtue of their positions as officers of Alliance/Tergeo, the actions taken by Gagnon and Fournier were the actions of Alliance/Tergeo.

applicable tax ($1,170.00), for a total of $19,800.00 USD per month.[9]  *Id.* at 155.  Power Up

China would then pay Dery, through Dery's consulting company, Moresco Enterprises Inc.,

$18,000.00 USD per month, which was the approximate amount he would have been paid under

the Alliance/Tergeo Agreement.  *Id.*  Alliance/Tergeo has expressly conceded in this case that

"prior to the lawsuit and the Orders, Mr. Dery was going to work for Alliance through [Power

Up China]," [Dkt. 310 at 9], and Alliance/Tergeo's witness Claude Delage testified that the

Alliance/Tergeo Board's investigation concluded that "Dery worked indirectly for Alliance

through Power Up China," [Dkt. 723 at 253].  Although his testimony on the issue was evasive,

Gagnon also conceded in his testimony that the agreement between Alliance/Tergeo, Power Up

China, and Dery in July 2020 was that Dery would perform work for Alliance/Tergeo under this

arrangement and that $18,000.00 of the monthly payment Alliance/Tergeo made to Power Up

China would go to Dery.  [Dkt. 702 at 150, 155, 202.]  Fournier reported this arrangement to Ed

Hopkins from Wogen "confidentially" during a September 1, 2020, phone call.  [Dkt. 702 at 29-

30] (Hopkins testifying regarding Exhibit 33).[10]  While Dery testified to the contrary, [Dkt. 704

---

[9] Dery's testimony directly conflicts with Gagnon's on this point.  Dery agrees that he was
introduced to Deragon by Gagnon at a dinner in July 2020.  [Dkt. 704 at 43.]  However, Dery
testified that his compensation was not discussed at all during that meeting.  [Dkt. 723 at 56-57.]
Dery further testified that he was the one who suggested compensation of $18,000.00 per month
because that was "a similar type of compensation" to the compensation he has received from
AMACOR and would have received under the Alliance Agreement.  *Id.* at 57. Given that Dery
emailed a proposed format for an invoice for $18,000.00 to Deragon at 10:07 a.m. the morning
after the dinner meeting, Exhibit 15A, the Undersigned finds Dery's testimony that compensation
was not discussed at the dinner meeting to be false.

[10] Fournier testified that Hopkins must have misunderstood what he said to him because Fournier
spoke "Franglais, [a] mix of French and English with him."  [Dkt. 723 at 131.]  He also testified
that "that was a phone call that was on a cell phone when I was out of my house" so "maybe
there was a misunderstanding or [I] wasn't heard properly."  *Id.* at 165.  The Undersigned finds
that Hopkins accurately conveyed what Fournier told him, which is consistent with the other
evidence of record, and that Fournier's testimony to the contrary is false.

at 44, 58], the Undersigned finds Dery's testimony on this issue to be not credible, for reasons discussed in detail below.

The Agreed Standstill Order was entered on September 4, 2020.  There is no dispute that, as of that date, any work performed by Dery for Alliance/Tergeo would be a violation of that order.  Indeed, Gagnon testified that Alliance/Tergeo understood that "through those judgments, we had to stop the work of Mr. Dery through Power Up China."  [Dkt. 702 at 158.]  Gagnon and Fournier[11] assert that, as of the date the Agreed Standstill Order was entered, Dery's work for Power Up China did not involve Alliance/Tergeo in any way.  Based on the following evidence, the Undersigned finds that assertion to be false.

---

[11] While Alliance/Tergeo opposes the contempt motion, the Undersigned notes that the testimony of Alliance/Tergeo's own witness in this case, Alliance/Tergeo Board member Claude Delage, is that he does not know whether Alliance/Tergeo violated the Orders.  *See* [Dkt. 723 at 251-52]. Delage was Executive Chairman of Alliance/Tergeo in March 2022 when AMACOR's original contempt motion was filed.  He testified that Alliance/Tergeo suspended Gagnon (who then resigned) and Fournier, who was terminated after an investigation, after Alliance/Tergeo received a letter from its counsel suggesting that Alliance/Tergeo had violated its commitment to AMACOR that it would not collaborate with Dery in any way.  Delage testified that the investigation conducted by the Alliance/Tergeo Board was specifically limited to the question of whether that commitment was violated; the Board did not investigate whether the Orders were violated as well.  *See* [Dkt. 723 at 228-29] (explaining that the Board did not consider the contempt allegations in deciding to terminate Fournier because "we were not trying to . . . do your job, you know"); *id.* at 251-52 (further explaining that "we were not in a position to decide, you know, if they did not obey to the court order or this is why we are here today . . . until [Judge] Dinsmore will decide, you know, we don't know if he breached or not").  Delage also testified that the Board's investigation did not conclude that Dery's work for Alliance/Tergeo ended when the Orders were entered, but rather that the Board only concluded that Dery worked for Alliance/Tergeo through Power Up China prior to the entry of the Orders.  *Id.* at 254.  In other words, given the opportunity to provide direct testimony as to whether it violated the Orders, Alliance/Tergeo did not do so, but rather admitted, through Delage's testimony, that it chose to remain willfully blind with regard to whether Gagnon and Fournier (and therefore Alliance/Tergeo) took actions that amounted to contempt of the Orders.  *See* [Dkt. 723 at 270] (Delage answering "no" to the Undersigned's question:  "Do you have any evidence as to when [the] collaboration [between Dery and Alliance] stopped?").

First, the payment arrangement between Alliance/Tergeo, Power Up China, and Dery did not change in any way as a result of the Agreed Standstill Order or the Agreed Injunction. Alliance/Tergeo continued to pay Power Up China the same amount each month until November 2021,[12] and Power Up China, in turn, continued to pay Dery the same amount until August 2021. *Id.* at 64.  No satisfactory explanation for that fact has been provided.  The explanation that Power Up China performed other work for Alliance/Tergeo, and that Dery performed other consulting work for Power Up China, and that both just happened to be worth precisely the same as the work Dery was performing for Alliance/Tergeo under the original arrangement strains credulity.  There are no documents that demonstrate that Alliance/Tergeo told Power Up China that their arrangement with regard to Dery's work was no longer valid.  Gagnon's insistence that he preferred to communicate such important things only verbally, [Dkt. 702 at 164-65], is not credible, especially in light of the ongoing litigation.  Even if Gagnon believed that verbal communications were "more directive" and avoided ambiguity, *id.* at 165, any prudent business person involved in litigation would also have documented in writing that such important

---

[12] Gagnon testified that he believed Alliance/Tergeo stopped making payments to Power Up China in December 2021.  [Dkt. 703 at 21.]  However, Delage testified that he learned of the payments to Power Up China after he became Executive Chairman of Alliance/Tergeo on September 30, 2021.  [Dkt. 723 at 212-13.]  He was told that the payments were being made "in order to get advice from Power Up China for the acquisition of equipment and stuff like that." *Id.* at 215.  He directed that the payments be stopped because their building project plans had changed and "we [didn't] even know if we [were] going to build the very same plant.  Maybe we are going to change." *Id.*  Specifically, at the end of 2021, Delage directed Patsie Ducharme, Alliance/Tergeo's CFO, not to pay Power Up China's two outstanding monthly invoices, and to direct Deragon to him if he took issue with that.  *Id.* at 216, 218; Exhibit 126A.  From the documentary evidence, it appears that Alliance's last payment to Power Up China was in November 2021 for services performed in October 2021.  *See* Exhibit 126A (Deragon resending November 2021 invoice along with December 2021 invoice on December 8, 2021, and noting that the former remained unpaid).

communications occurred.  In addition, there are no internal Alliance/Tergeo documents discussing the decision to continue to pay Power Up China the same amount after Alliance/Tergeo would allegedly no longer be receiving the services of Dery, when it was those services—not any services of Power Up China—that were valued at $18,000.00 per month in the first place.  *Id.* at 150 (Gagnon's testimony that "What we did discuss was the value, what was the value.  The value of the services provided by Power Up China.  And so of course, the flip side of that was that Power Up China had to have an agreement with Alain Dery.  So of course, yes, as a consequence, Mr. Dery worked on our files, as a condition.").  To be clear:  Gagnon testified that, prior to the Agreed Standstill Order, $18,000.00 of each monthly payment that Alliance/Tergeo made to Power Up China was to be forwarded to Dery.  It is also clear that Power Up China was working on sourcing equipment for Alliance/Tergeo prior to the institution of those monthly payments.  *See, e.g.* Exhibit 125 (bid proposal sent by Deragon in July 2020 for piece of equipment for Alliance/Tergeo); [Dkt. 702 at 140] (Gagnon's testimony that Power Up China began sourcing equipment for Alliance/Tergeo prior to June 2020).  Power Up China was doing that work without receiving a monthly payment prior to the arrangement with Dery, and intended to continue doing that work without receiving a monthly payment—beyond a $630.00 service fee—after the arrangement with Dery.[13]  Gagnon's insistence that all of a sudden Power

---

[13] Indeed, Gagnon testified that Alliance had paid Power Up China a fee in 2018 for acquiring equipment for Alliance/Tergeo.  [Dkt. 703 at 52.]  This was not a monthly fee, but rather a fee for "specific transactions"—presumably a commission tied to the cost of the equipment that was procured.  Fournier testified that Power Up China had been getting quotes for equipment for Alliance/Tergeo to use in a feasibility study that was required under Canadian law, but Alliance/Tergeo was not purchasing any of the equipment, so Power Up China was not receiving any commissions.  [Dkt. 723 at 195.]  According to Fournier, the monthly payment to Power Up China was instituted because Deragon "said, I am not going to keep giving you quotes ad nauseam unless you buy something."  *Id.*  This does not explain how the value of Power Up

Up China's work merited precisely $18,000.00 per month simply because the Agreed Standstill Order had been entered is simply not believable.

In addition, the description of the work performed on the invoices submitted to Power Up China by Dery did not change following the entry of the Agreed Standstill Order.  Dery's initial invoice, for work performed in August 2020, stated that it was for work on a "semi finished aluminum" project.  Exhibit 15A.  The invoices for September, October, November, and December 2020 all stated the same.  Exhibit 17.  Later invoices submitted by Dery stated that they were for work on a "carbon blocks" project.  *Id.*; Exhibit 74.

Perhaps most incredible of all, Dery testified that there are no documents—literally none—that relate to **any** work that Dery did for Power Up China beyond the monthly invoices, despite his testimony that he spent an average of thirty hours per week for thirteen months performing consulting work for Power Up China.  [Dkt. 704 at 50-51.]  Dery's testimony on that point borders on fantastical:

> The nature of the work with Power Up China was that we would discuss ideas and concepts face-to-face, and I didn't have any documents.
>
> ***
>
> You know, if someone hires me and says that they prefer that we see each other and talk about ideas, it works perfectly well for me.

---

China's work acquiring quotes happened to be valued at precisely the same amount as Dery's work for Power Up China.  It also does not explain the $630.00 service fee that was charged by Power Up China; that service fee is more readily explained as Power Up China's fee for funneling payments from Alliance/Tergeo to Dery.

*Id.* at 56.[14]  Dery testified that he did internet research, read articles, and had meetings with

Deragon once or twice a month.  [Dkt. 704 at 51-53.]  However, no related internet search

history, articles, or calendar entries were produced in discovery.  *Id.* at 53-54.

Dery received his last payment from Power Up China on July 14, 2021, which was for his

June 2021 invoice.  Exhibit 74, Exhibit 91.  He also sent invoices to Power Up China in July and

August 2021, Exhibit 74, but those invoices were not paid.  [Dkt. 723 at 100.]  Dery testified that

he did not push Deragon for payment of those invoices, despite the fact that he had performed

work in those months and the fact that the unpaid sums represented approximately 25% of his

entire income in 2021, because he preferred to remain on good terms with Deragon.  *Id.* at 101.

Finally, Dery's story with regard to his work for Power Up China is inconsistent with that

of Alliance/Tergeo and the testimony of Gagnon.[15]  As noted above, Alliance/Tergeo admits that

---

[14] Upon questioning by his counsel, Dery testified that he had a "very similar arrangement" with
a prior employer, Standard Resources, [Dkt. 723 at 55], and that his relationship with Albert
Hayoun at Standard Resources was "exactly the same" as his relationship with Deragon.  *Id.* at
61.  This was clearly meant to imply that the fact that there are no documents relating to his work
for Power Up China is not unusual.  However, on cross-examination, Dery conceded that, in fact,
his work for Standard Resources generated "a lot" of documents.  *Id.* at 97.

[15] Dery's testimony is consistent with that of Fournier, who testified that "[a]s far as I was
concerned, there was no link" between Power Up China's work for Alliance/Tergeo and Dery's
work for Power Up China.  [Dkt. 723 at 155.]  Rather, according to Fournier, Power Up China
was simply a convenient place for Dery to work temporarily, until Alliance/Tergeo could
determine whether, in light of this litigation, it would be possible for him to come to work for
Alliance/Tergeo as originally planned.  *Id.* at 132.  While this scenario is plausible in the
abstract, the evidence as a whole supports Gagnon's version of events.  The Undersigned notes
that the arrangement between Power Up China, Alliance/Tergeo, and Dery—and the fact that the
arrangement violated Alliance/Tergeo's commitment to AMACOR that it would not collaborate
with Dery, *see* Exhibit 10—is one of the reasons that Alliance/Tergeo gave for terminating
Fournier, *see* Exhibit 81A.  Fournier is litigating against Alliance/Tergeo regarding his
termination.  [Dkt. 723 at 157.]  Accordingly, Fournier has an incentive to deny the accuracy of
Gagnon's testimony regarding that arrangement.  Further, other testimony given by Fournier
seems to concede that there was initially a link.  For example, Fournier was asked the following
on cross-examination:  "After the court orders. . . you did not have any involvement in

the original arrangement was for Dery's work as a consultant for Power Up China to benefit Alliance/Tergeo.  However, Dery testified that "all the work I did for Power Up China was not related to Alliance as far as I knew."  [Dkt. 704 at 58.]  Dery also submitted two declarations to the Court in which he stated the following:  "At no time during my consulting relationship with Power Up China did I ever perform any services that I intended to benefit Alliance."  [Dkt. 314-1 at ¶ 24, Dkt. 507-1 at ¶ 24.]  These statements are demonstrably false.  Dery conceded that he met with Remi Belliveau, Alliance/Tergeo's plant manager, on August 26, 2020, while he was consulting for Power Up China.  [Dkt. 704 at 58, 62.]  Dery further conceded that "[t]here is a document that shows that I answered a few questions [for Alliance] that seem to be very general and unimportant" about magnesium production warehousing.  *Id.* at 58.

In fact, there are numerous email chains that demonstrate that Dery was working on sourcing magnesium for Alliance/Tergeo in August 2020.  First is an email chain between Belliveau and Dery that took place between August 18, 2020, and August 21, 2020, in which Dery discusses sourcing magnesium scrap for Alliance/Tergeo and requests information from Belliveau regarding Alliance/Tergeo's timeline for needing scrap.  Exhibit 28A.  Dery's email to Belliveau ends:  "Let me know quickly to start the process ASAP."  *Id.*  Dery's explanation that this email exchange does not reflect work he was doing on behalf of Alliance/Tergeo, but rather the fact that "[a]t that time, I believed that I would be potentially working in the future, in the

---

determining how much Power Up China was paying Mr. Dery, correct?"  *Id.* at 169.  Fournier answered:  "The negotiations for the price, as far as I remember, that was Michel [Gagnon]."  *Id.*  Fournier, like Gagnon, also distinguished between the time before the Orders were entered and the time after, and testified that after the Orders were entered "the actions we were able to do [with Dery] . . . drastically changed."  *Id.* at 167.

near future with[] Alliance, but I wasn't certain about that," [Dkt. 704 at 64], is simply not credible.

Next is an email chain between Dery and Fournier on August 21, 2020.  Exhibit 29A. Fournier forwarded to Dery an email he received from a third-party regarding a source of magnesium scrap.  Dery responded with detailed thoughts about the proposed scrap and ended his email:  "To be discussed in detail soon to develop a strategy." *Id.*  This is clear evidence that Dery was working with Alliance/Tergeo with regard to sourcing magnesium scrap at that point, contrary to Dery's denial of that fact.

Another email exchange between Belliveau and Dery containing detailed information about warehouse storage needs took place on August 27, 2020.  Exhibit 30A.  When asked about this exchange, Dery replied that he "hadn't received the document from the Court at that time." [Dkt. 704 at 66.]  That is true, but also entirely irrelevant to Dery's claim that he performed no work for the benefit of Alliance/Tergeo at any time during his consulting relationship with Power Up China.

Finally, Alliance/Tergeo suggests that the fact that Alliance/Tergeo continued to pay Power Up China for a few months after Power Up China stopped paying Dery is evidence that the payments by Alliance/Tergeo to Power Up China were unrelated to the payments by Power Up China to Dery.  The Undersigned disagrees.  Wogen produced Exhibit 33, which is the email in which Hopkins describes the "confidential" plan for Dery to work through Power Up China to procure magnesium scrap for Alliance/Tergeo, rather than working for Alliance/Tergeo directly, to AMACOR on July 26, 2021.  [Dkt. 704 at 4-5.]  Power Up China stopped paying Dery the following month.  Once the Hopkins email was produced, AMACOR was aware of the relationship between Dery and Power Up China and clearly would conduct discovery regarding

that relationship.  It would have been far too suspicious if both payments were stopped at the same time; having Alliance/Tergeo continue its payments for a few months was yet another attempt to hide the fact that Dery had been performing work for Alliance/Tergeo through Power Up China.

### 5. *Efforts to Conceal Dery's Work for Alliance/Tergeo*

The evidence further supports a finding that Fournier, Gagnon, and Dery conspired to conceal the fact that Dery was assisting Alliance/Tergeo through Power Up China and to avoid leaving a paper (or digital) trail regarding that fact.  When the first monthly payment was made by Alliance/Tergeo to Power Up China, Deragon replied to Gagnon's email confirming that the payment had been made, saying:  "Thank you.  It will be forwarded to whom it may concern." Exhibit 20; [Dkt. 702 at 156].  The avoidance of Dery's name in communications belies Alliance/Tergeo's position, and Gagnon's insistence throughout his testimony, that there was nothing improper about the arrangement between Alliance/Tergeo, Power Up China, and Dery. In addition, Belliveau testified that he was instructed by Fournier not to communicate with Dery directly because of the litigation.[16]  He was first instructed to contact Dery through Deragon; later he was told to contact Dery through Fournier.[17]  Fournier also instructed Belliveau to avoid

---

[16] Belliveau testified by means of excerpts from a videotaped deposition.  The transcript of those excerpts is found at Exhibit 108.

[17] Fournier testified that Belliveau—who is a native French speaker—misinterpreted what Fournier told him about Dery's work with Power Up China.  [Dkt. 723 at 132-33.]  Fournier denies that he told Belliveau that if he wanted to communicate with Dery he had to go through Deragon; rather, he testified that he told Belliveau that "Mr. Dery's new employer was Mr. Deragon, that we had nothing to do with him anymore in that capacity." *Id.* at 166.  The Undersigned does not believe that Belliveau misunderstood his conversation with Fournier and, in light of Belliveau's documented communications with Dery via Deragon, the Undersigned credits Belliveau's version of the conversation and finds Fournier's testimony to the contrary to be false.

using Dery's name in communications; Belliveau instead referred to Dery as "Mr. X" or "Alain X." Exhibit 108 at 10; *see also* Exhibits 24A, 26. Tellingly, Belliveau did not testify that he was ever instructed to stop seeking Dery's assistance after the entry of the Standstill Order or the Agreed Injunction.

Consistent with Belliveau's testimony, the evidence shows that on September 8, 2020, after the entry of the Agreed Standstill Order, Cyril Trincat, an employee of Seneca, Alliance/Tergeo's engineering firm, emailed Belliveau discussing a technical issue and asking if "Mr. X" could help with it. Exhibit 36A. Belliveau forwarded the email to Fournier the following day. *Id.* Fournier did not reply with a reminder that Alliance/Tergeo was not to communicate with Dery because of the Court's Order. [Dkt. 723 at 189.] Fournier testified that he "took care of it" in the morning at their engineering meeting. *Id.* However, a few days later, Belliveau forwarded the email to Deragon, asking him to call him about it when he had a moment. Exhibit 40A.

Dery testified that he never received that email and that he has no recollection of speaking to Trincat. [Dkt. 723 at 65.] He further testified that he knows "very little" about the subject of the email, magnesium shredders.[18] *Id.* Fournier also testified that Dery would not have had the expertise to answer the question asked by Trincat. [Dkt. 723 at 147.] The relevant point, however, is that **after** the entry of the Standstill Order, Belliveau still believed it was appropriate for him to seek assistance from Dery, using Deragon as a conduit.

---

[18] The Undersigned notes that Dery provided what he characterized as "fairly general information" to Alliance/Tergeo in August 2020 regarding their selection of a shredder, [Dkt. 723 at 93], so he is not entirely ignorant on the subject.

In addition to Alliance/Tergeo's use of code names and the avoidance of direct communication with Dery, Dery directed Alliance/Tergeo to use newly created email addresses that did not include his name.  Indeed, on June 9, 2020, the day Dery received the Termination Letter that included document preservation instructions, Dery provided Gagnon with a new email address to use for all future communications—deaj2566@gmail.com.  Exhibit 5A.  Three days later, Gagnon emailed Deragon with a "message from Alain," asking Deragon to email Dery at the email address deal722223@gmail.com.  Exhibit 11.  The Undersigned finds that these new email addresses were created and used with the hope that emails to and from those addresses would not have to be turned over in discovery because they would not turn up when Dery's name was searched.  The Undersigned finds that Dery used the email address daj427@videotron.ca, a personal email address that he had created years earlier, to communicate with Alliance/Tergeo employees and Deragon for the same reason.  Otherwise, Dery would have used his business email address, alain.dery@morescoinc.com, or the personal email address he used for things such as sending his invoices to Deragon, alain_dery@videotron.ca.  *See* Exhibit 74.

In addition, at the end of June or beginning of July 2020, Dery purchased a Motorola mobile phone.  [Dkt. 723 at 5.]  Prior to that time, he had used an iPhone; he continued to use the iPhone regularly after he purchased the Motorola phone, but began to use the Motorola phone as well.  In July through November 2020, Dery used the Motorola phone mainly to communicate with employees of Alliance/Tergeo, with Deragon, and, as discussed below, with Caroline Verreault, who was Gagnon's wife, both via text message and calls.  *Id.* at 7-13 and 42-43; Exhibit 93 (annotated phone records).

Dery testified that he purchased the Motorola phone after he was terminated by AMACOR because his "iPhone was acting strangely.  I was hearing strange noises, and

conversations were cutting out." [Dkt. 723 at 40.] Dery further testified that he was afraid that AMACOR had access to his iPhone and his emails because AMACOR had access to his entire iCloud. *Id.* He further testified that in May 2020, after he had a conversation with AMACOR CEO Jan Guy in which he told Guy he was planning to leave AMACOR, he received "messages warning me that my iCloud had been accessed and that things had been moved . . . from it." *Id.* at 40-41. Dery's iCloud contained AMACOR information, as well as his personal passwords and financial information. *Id.* at 41.

The Undersigned simply does not believe this explanation for Dery's purchase of the Motorola phone. If Dery were truly worried about AMACOR having access to his personal information, the reasonable response would have been to change the passwords to his various accounts.[19] There is no evidence that Dery did so, even with regard to his iCloud account, and he testified that he did not know if he did so. [Dkt. 723 at 94.] The Undersigned finds that Dery purchased the Motorola phone for one reason: so that he could communicate with Alliance/Tergeo and Deragon and avoid having to produce those communications in this lawsuit.

Finally, Gagnon began to communicate with Dery indirectly, through his wife, Caroline Verreault.[20] [Dkt. 702 at 175.] Specifically, Verreault—who had never met Dery—would communicate with Dery using her cell phone, which had been issued to her by her employer. *Id.* at 175-76. The number Verreault would receive messages from and respond to was the Motorola

---

[19] The same is true with regard to the creation of new email addresses to communicate with Deragon and Alliance/Tergeo. Dery testified that he did so because he "knew AMACOR could access my other accounts so I created a new one that was not part of the AMACOR accessible accounts." [Dkt. 723 at 52.] Obviously, simply changing the password of his old email accounts and/or utilizing two-factor authentication would have prevented AMACOR from accessing them.
[20] Gagnon also sometimes communicated directly with Dery during the same time period. *See* Exhibit 93. Those direct communications were disclosed during discovery. [Dkt. 703 at 34.]

phone. *Id.* at 177. There was also a five-minute phone call logged between Verreault's number and the Motorola phone. Exhibit 93. The Undersigned finds that this convoluted system[21] was another means of avoiding creating a paper (or digital) trail that would reveal the ongoing work Dery was performing for Alliance/Tergeo.

The communications between Dery and Verreault's phone were not preserved by Alliance/Tergeo[22] and their existence was not disclosed by Alliance/Tergeo in discovery until 2022. Prior to that time, Alliance/Tergeo had responded to AMACOR's Interrogatory Number 2, which sought information about all communications between Alliance/Tergeo[23] and Dery, numerous times without disclosing the communications. *See* Exhibit 64 (Alliance/Tergeo's initial interrogatory responses); Exhibit 67 (Alliance/Tergeo's supplemental interrogatory responses); Exhibit 69 (Alliance/Tergeo's second supplemental interrogatory responses, verified under oath by Gagnon); Exhibit 75 (Alliance/Tergeo's fourth supplemental interrogatory responses, also verified under oath by Gagnon). Gagnon's insistence that he did not disclose the communications involving his wife because he did not recall that those communications occurred, [Dkt. 702 at 186, Dkt. 703 at 31], is not credible.[24] AMACOR served its

---

[21] For example, on August 12, 2020, Gagnon texted his wife and asked her to text "Alain" because Gagnon had "just tried to reach [him]." Exhibit 23A. Gagnon had no satisfactory response when it was pointed out to him that he "could have texted Alain Dery in the same time it took you to send this text to your wife." [Dkt. 703 at 55.]

[22] As discussed more fully in the Undersigned's Report and Recommendation regarding AMACOR's spoliation motion, Verreault broke her phone and it was replaced by her employer. At that time, all of the text messages on the phone were deleted per the employer's policy.

[23] Given the definitions in the interrogatories, there is no question that Verreault's communications with Dery on Gagnon's behalf should have been disclosed by Alliance/Tergeo.

[24] Gagnon testified that he did not remember the text messages because he did not receive them, so "there was no way for me to know." [Dkt. 703 at 31.] However, he also testified that this wife was "very meticulous" and would always pass messages along to him, *id.* at 84, so he clearly was aware of each message that Dery sent to Verreault's phone.

interrogatories on October 2, 2020, which was just two days after a text exchange between Dery and Gagnon's wife's phone occurred; numerous texts and calls between the two numbers, including a five-minute phone call, occurred after the interrogatories were served.  *See* Exhibit 93.  Given the unusual circumstance[25] of routing business-related communications through his wife—a person who did not work for Alliance/Tergeo—it is simply not credible that Gagnon would "forget" all about those communications.[26]

　　　　Given that Alliance/Tergeo went to all of these lengths to avoid attaching Dery's name to various communications, the fact that there are documents in which Deragon discusses the procurement of magnesium scrap without mentioning Dery, *see* Exhibits 55A and 58, is not convincing evidence that Dery was not involved in that procurement process.  Nor is the fact that few documents exist following the entry of the Orders that document Dery's work for Alliance/Tergeo evidence that such work did not occur; it simply shows that the conspiracy to keep evidence of that work from being discovered was largely successful.[27]

---

[25] Gagnon himself described it as an "exceptional situation."  [Dkt. 703 at 83.]

[26] The Undersigned notes that, when asked on cross-examination whether his wife "act[ed] in that capacity for you as a de facto assistant or secretary before the summer or fall of 2020," Gagnon did not actually answer the question.  Instead, his response was:  "Well, quite simply, she was my spouse, and she helped me."  [Dkt. 703 at 28.]

[27] Alliance argued in its closing argument that "[i]f Mr. Dery was doing something for Alliance during the prohibited time period, there would be documentary evidence of it, Your Honor. There is none.  So AMACOR is left with the 'it must have happened' argument that it made." [Dkt. 727 at 66.]  Given that there is also no documentary evidence regarding the hundreds of hours of work Dery allegedly performed for Power Up China, it would not be reasonable to draw any inference from the absence of documentary evidence relating to Dery.

### B. Alliance/Tergeo's Talks with Apple

Gervais Jacques was a member of Alliance/Tergeo's Board of Directors during the relevant time period.  Exhibit 107 at 1.[28]  Jacques had industry contacts that were useful to Alliance/Tergeo, including contacts with Apple.  *Id.* at 2.  Beginning in October 2020, Jacques facilitated discussions between Alliance/Tergeo and Jim Yurko, a strategic project manager at Apple, about potential sales of magnesium.  *Id.* at 3.  Although Jacques initially testified adamantly that the discussions with Apple involved only primary magnesium, when confronted with evidence to the contrary, he conceded that Alliance/Tergeo "was trying to establish a relationship with Apple, and we were striving to do so while we were waiting [for primary production to begin] and while using secondary."  *Id.* at 8.  In other words, as Jacques explained, Apple "is an iconic client, and [Gagnon] was trying by all means to do business with" Apple because "it was important to also build Alliance's history in dealing with such a customer."  *Id.*

The evidence in question is contained in Exhibit 59, which consists of emails exchanged between Gagnon and Yurko.  On October 22, 2020, Yurko asked whether Alliance/Tergeo would be able to produce a particular alloy, ZK60.  Gagnon responded:  "Yes we will be able to produce ZK60 after start-up of our primary section which should happen in Q4.  We can discuss a plan B if you need it before Q4." Yurko replied:  "The potential value proposition of Alliance Magnesium will be a combination of using 1) high recycled content and/or 2) low C02e produced primary for ZK60 alloys."  He then asked what the timeline would be for producing ZK60.  Gagnon responded:  "We will start our recycling facility in April 2021 therefore

---

[28] Jacques' testimony was presented by means of excerpts from a videotaped deposition; a transcript of those excerpts is contained in Exhibit 107.

producing quality ingots with your alloy by August 2021 should be realistic."  In other words, Gagnon offered to sell a recycled magnesium product to Apple.  When Yurko did not reply, Jacques followed up and reiterated in a November 18, 2020, email that Alliance/Tergeo could produce recycled ingots for Apple by August 2021.  Exhibit 60.  Apple responded the same day that if the alloy Apple needed could be "made with green primary from your process or high recycle content, both would be interesting."  *Id.*

### C.  Conclusion

Based on the evidence set forth above, the Undersigned has no difficulty concluding that AMACOR has established by clear and convincing evidence that Alliance/Tergeo, Gagnon, Fournier, and Dery violated the Orders by continuing to use Dery to assist Alliance/Tergeo in the magnesium industry after the Orders were entered.  This violated the unambiguous command in the Agreed Standstill Order that "Dery is prohibited from working in any capacity for Alliance or in the magnesium industry during the term of this Order," [Dkt. 28 at 1], and the unambiguous commands in the Agreed Injunction that "Alliance and those acting in concert or participation with it are hereby enjoined and restrained from . . . employing or using the services of Dery, whether directly or indirectly, through trial in this matter" and that "[t]hrough June 8, 2022, Dery is enjoined and restrained from working in any capacity in the magnesium industry."  [Dkt. 59 at 2.]  There is no question that these violations of the Orders were significant.  Finally, far from making a "reasonable and diligent effort to comply" with the Orders, the Undersigned finds that Alliance/Tergeo, Gagnon, Fournier, and Dery never intended to comply with the Orders.  Rather, prior to agreeing to the entry of the Orders, Alliance/Tergeo, Gagnon, Fournier, and Dery put a system in place in which (they believed) Alliance/Tergeo would be able to continue to surreptitiously utilize Dery's services without that being discovered by AMACOR or the Court.

25

This included, *inter alia*, the guise of Dery working as a consultant to Power Up China, the avoidance of communicating with Dery in writing directly and the use of code names and email addresses that did not include Dery's name when they did so, and the use of Dery's Motorola phone and Gagnon's wife to communicate with Dery to avoid having to reveal those communications in the course of discovery in this case.  Thus, the Undersigned finds by clear and convincing evidence that Alliance/Tergeo, Gagnon, Fournier, and Dery are in civil contempt of the Orders based on these actions.

The Undersigned also finds that the clear and convincing evidence, set forth in detail above, shows that Alliance/Tergeo's discussions with Apple violated the Orders.  Specifically, those discussions violated the unambiguous command in the Agreed Standstill Order and the Agreed Injunction that Alliance/Tergeo was enjoined from "participating, directly or indirectly . . . in the . . . solicitation of orders . . . or negotiation of contracts for potential sales of recycled magnesium" through December 31, 2020.  [Dkt. 28 at 1, Dkt. 59 at 1.]  The Undersigned further finds that these violations of the Orders were significant, given the fact that Apple was an "iconic client" and that having such a client would have assisted Alliance/Tergeo beyond simply any profit it would have made from its sales to Apple by helping to establish Alliance/Tergeo's reputation in the industry.  A "reasonable and diligent effort to comply" with the Orders would have required Alliance/Tergeo not to pursue the sale of secondary magnesium to Apple until after December 31, 2020; instead, the clear and convincing evidence shows that Alliance/Tergeo affirmatively pursued those sales in October and November 2020.  Thus, the Undersigned finds by clear and convincing evidence that Alliance/Tergeo is in civil contempt of the Orders based on these actions.

26

### IV.  Findings and Conclusions Regarding Wogen

Ed Hopkins, Wogen's[29] business development and sales marketing manager, testified at the hearing.  [Dkt. 702 at 9.]  At all relevant times, Wogen or one of its related companies has been Alliance/Tergeo's exclusive distributor in the United States.  In that role, Wogen purchases all of Alliance/Tergeo's magnesium products that will be sold within the United States and then markets and sells those products to the end customers.  *Id.* at 12.  The initial contract between Alliance/Tergeo and Wogen was executed on August 15, 2018.  Exhibit 116.  That agreement only contemplated the sale of primary magnesium.  A supplemental agreement was executed on April 17, 2019, to include the sale of secondary magnesium.  [Dkt. 703 at 48; Dkt. 528.]

Once the Agreed Standstill Order was entered on September 4, 2020, Wogen understood that, pursuant to that Order, it was not permitted to market Alliance/Tergeo's recycled magnesium.  Exhibit 47.  As Laura Bell, the person in charge of the Wogen entities' worldwide magnesium sales, put it in an October 16, 2020, email in which she summarized a meeting with Alliance/Tergeo:

> The upshot is that we still can't really go out there and promote the project and lay the groundwork for the first production in March/April until the injunction is lifted, which is a frustration.

*Id.*; *see also* [Dkt. 702 at 45] (Hopkins agreeing that "Wogen understood that it was prohibited for [sic] laying the groundwork for sales of Alliance's recycled magnesium products").

One established customer of Wogen was Arconic Corporation.  [Dkt. 702 at 55.]  On August 17, 2020, Bell's contact at Arconic, Benjamin Franck, emailed Bell to "introduce" Erin

---

[29] There are various Wogen entities.  Wogen Resources America LLC is the Defendant in this case.  Unless otherwise specified, "Wogen" refers to Wogen Resources America LLC.  Wogen did not become a party to this case until December 12, 2021.

Murray.  Exhibit 34.  Murray was Franck's successor at Arconic and would be taking over

responsibility for Arconic's purchase of metals globally.  Bell's response to Franck and Murray

included the following:

> Hopefully we will continue to have the opportunity to work together on the US side
> of things with the Alliance material.  Things are progressing very well with the
> project.  They are fully funded now and construction of the plant is well under way.
> The first secondary Mg units are expected in Q1 2021 with primary units following
> Q3.  [Hopkins] and I will send some further details on this separately.

*Id.*  On September 7, 2020, Bell emailed Murray asking to set up a call with her, noting "[w]e are

the exclusive distributers for the new Alliance Magnesium project in Canada[,] so we hope to be

able to work with you more closely for your US plants in the coming months as well."  *Id.*

Murray, Bell, and Hopkins had a call on September 10, 2020.  The evidence shows that

Alliance/Tergeo's secondary magnesium was discussed on that call, inasmuch as in a follow-up

email, Murry stated the following: "Finally, confirming our percent pure secondary magnesium

is 70/30 as discussed, and we hope to boost this to 50/60 in the coming years." Exhibit 37.  In

response, Hopkins noted that Wogen "look[ed] forward to providing samples for the secondary

and primary as they become available next year . . . ." *Id.*  While Hopkins testified that "this is

prior to us learning of the standstill order on September 10th," [Dkt. 702 at 60], it was a full six

days after the entry of the Standstill Order.

In addition to Arconic, Wogen also discussed Alliance/Tergeo's secondary magnesium

business with Hydro Extrusion after the entry of the Agreed Standstill Order.  Exhibit 48.  On

October 14, 2020, Hopkins emailed Michael Mummey, a Metal Procurement Specialist at Hydro,

asking for a meeting to discuss Hydro's metals needs.  *Id.*  Hopkins informed Mummey that

Wogen would be the "US representative for the new Alliance Magnesium primary and recycled

Mg plant now begin built in Eastern Canada that will begin production in 2021" and offered to "give you an update on the Alliance Mag project and their expected production timetables." *Id.*[30]

Wogen's defense to AMACOR's allegation that it violated the Orders is two-fold.  First, Hopkins insisted that any promotion of Alliance/Tergeo products by Wogen while the Orders were in place was limited to primary magnesium, which was not prohibited by the Orders.  That position is belied by the evidence set forth above, which clearly shows that Wogen was working to lay the groundwork for sales of both primary and secondary magnesium.

Wogen also argues that it could not have violated the Orders because Alliance/Tergeo did not have any magnesium—primary or secondary—to sell until after the Orders had expired.  As Hopkins put it:  "Do not sell what you do not have, Rule 1 of trading." [Dkt. 702 at 89.]  This argument is disingenuous.  In fact, Hopkins conceded on redirect that "[w]ere I not bound by an injunction, I could have solicited sales for secondary magnesium." *Id.* at 106.

Clearly, the Orders prohibited more than simply making final sales; the express language of the Orders prohibits "the manufacture, sale, solicitation of orders, acceptance of business, or negotiation of contracts for potential sales of recycled magnesium." [Dkt. 28, Dkt. 59.]  Indeed, shortly before the entry of the Agreed Standstill Order, on August 24, 2020, Hopkins participated in a call with Alliance/Tergeo's full marketing committee and reported on the call to Bell. Exhibit 33.  In response, Bell instructed Hopkins to follow up with Gagnon and Fournier regarding presentation slides and remarked that Wogen "need[ed] to start arranging calls with potential buyers." *Id.*  In other words, it was time for Wogen to begin the process of soliciting

---

[30] AMACOR introduced evidence regarding Wogen's communications with another Wogen customer, Novelis.  *See* [Dkt. 702 at 73-78].  The Undersigned does not find that this evidence shows that these communications related to secondary magnesium.

orders for recycled magnesium.  Wogen, through both Bell and Hopkins, conceded that it knew that the Orders prevented Wogen from "promot[ing] the project and lay[ing] the groundwork" for sales of recycled magnesium.  Exhibit 47; [Dkt. 702 at 45].  Yet Wogen continued to do just that, at least with regard to Arconic and Hydro.

The Undersigned finds it telling that Hopkins testified that he was never provided with a copy of the Orders, [Dkt. 702 at 81], and he was not given any specific instructions regarding how to comply with the Orders, *id.* at 40.  This suggests that Wogen was not as serious about fulfilling its obligation to comply with the Orders as it should have been.

That said, however, the Undersigned cannot find by clear and convincing evidence that Wogen is in contempt of the Orders.  As discussed above, the Orders set forth an unambiguous command prohibiting "solicitation of orders" and "negotiation of contracts for potential sales of" recycled magnesium.  Wogen's actions clearly violated the intent of that command.  However, unlike Alliance/Tergeo's affirmative actions with regard to Apple, the Undersigned does not find that Wogen's actions constituted a significant violation of the Orders.  The evidence before the Court shows only very general discussions of secondary magnesium by Wogen; those discussions can reasonably be characterized as acknowledgement that future sales would be possible rather than solicitations or negotiations.  Therefore, the Undersigned finds that Wogen is not in civil contempt of the Orders.

The Undersigned recognizes that AMACOR argues that Wogen should be held jointly liable for Alliance/Tergeo's contempt because Wogen and Alliance/Tergeo were part of an enterprise under which Dery performed work for Alliance/Tergeo in violation of the Orders.  *See* [Dkt. 727 at 38-39].  However, the evidence shows only that Wogen knew on September 1, 2020, prior to the entry of the Orders, that Dery was still assisting Alliance/Tergeo through his

work with Power Up China.  Exhibit 33.  There is simply no evidence that Wogen knew that Dery continued to do so after entry of the Orders.  More importantly, even if Wogen did have that knowledge, simply having that knowledge is not sufficient to make Wogen jointly liable for Alliance/Tergeo's violation of the Orders.  Rather, as the case cited by AMACOR in its closing argument makes clear, "the law limits contempt liability to non-parties that 'act with an enjoined party to bring about a result forbidden by the injunction . . . if they are aware of the injunction and know that their acts violate the injunction.'" *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1304-05 (Fed. Cir. 2012) (quoting *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1353 (Fed. Cir. 1998)).[31]  In other words, "those who act in concert with an enjoined party to assist in violating the injunction may also be held in contempt." *Id.*  There is simply no evidence that Wogen assisted Alliance/Tergeo in any way with regard to Dery's work for Alliance/Tergeo, either before or after the entry of the Orders.

## V. Remedies

In its briefs in support of the instant motion, AMACOR seeks the following remedies:

1. entry of default judgment in favor of AMACOR and against Defendants;

2. extension of all terms of the Standstill Order and Agreed Injunction for a period of twelve months from the date of the resolution of the instant motion, including, but not limited to, the prohibitions against working with Dery, using AMACOR's trade secrets and confidential information, and "participating, directly or indirectly, or assisting any third party, directly or

---

[31] The case cited by AMACOR in its reply brief, *Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983), supports the same conclusion, as it also requires that "the defendant must knowingly and substantially assist the principal violation."  Here, the "principal violations" at issue are the continued use of Dery's services and the soliciting of sales from Apple.  There is simply no evidence that Wogen assisted Alliance/Tergeo in those violations in any way.

indirectly, in the manufacture, sale, solicitation of orders, acceptance of business, or negotiation of contracts for potential sales of recycled magnesium," and including a specific prohibition against Alliance/Tergeo transacting business with Power Up China, Heneken, or any other entity at which Dery is employed or with which Dery is affiliated;

    3.  an order that Defendants Alliance/Tergeo, Gagnon, and Fournier, jointly and severally, must disgorge the sum of $216,000.00,[32] and any compensation that Dery has received at Heneken,[33] plus interest, and pay the sum to AMACOR;

    4.  an order that Defendants, Gagnon, and Fournier, jointly and severally, must pay AMACOR's attorneys' fees and costs related to the investigation, preparation, and prosecution of this Renewed Motion for Contempt and AMACOR's initial Motion, which was withdrawn upon discovery of new violations; and

    5.  all other just and appropriate relief.

[Dkt. 462-1 at 67.][34]

    With the exception of the request for fees and costs, the Undersigned finds that none of the other remedies sought by AMACOR are appropriate civil contempt remedies in this case. For civil contempt, remedies must be

---

[32] In its closing argument, AMACOR calculated this figure as $234,000.00.  [Dkt. 727 at 17.] While Dery sent Power Up China invoices totaling that amount, *see* Exhibits 17 and 74, it appears that Dery was only paid $198,000.00 by Power Up China because his last two invoices were not paid.  [Dkt. 704 at 56; Dkt. 723 at 100.]

[33] As discussed above, the Undersigned does not find that Dery's work at Heneken violated the Orders.

[34] In its closing argument, AMACOR asked for additional remedies against Gagnon and Fournier:  disgorgement of "an appropriate percentage of their last year's salaries."  [Dkt. 727 at 34.]  AMACOR does not articulate any reason why that would be an appropriate civil contempt remedy; what Gagnon and Fournier were paid while working at Alliance/Tergeo bears absolutely no relationship to any injury suffered by AMACOR.

either coercive or remedial.  It is designed either to compel the contemnor into compliance with an existing court order or to compensate the complainant for losses sustained as a result of the contumacy.  Criminal contempt sanctions are punitive: they are meant to vindicate the authority of the court.

A contempt fine is generally remedial when it is paid to the complainant, and punitive when it is paid to the court.  The recipient of the fine is not, however, the sole determinant of whether the contempt is civil or criminal. Rather, the distinction depends on something more fundamental: what the relief is meant to achieve. Because conditional penalties are specifically designed to compel the doing of some act, they are coercive and therefore qualify as civil contempt.  Similarly, a monetary penalty for a wrong committed in federal court is civil in nature if the payment is designed to compensate for harm done.  But contempt is criminal if its purpose is to punish the contemnor, vindicate the court's authority, or deter future conduct.  A flat, unconditional fine that is not meant to compensate for actual harm is a sanction for criminal contempt.

*Lightspeed Media Corp*, 830 F.3d at 508 (internal quotation marks and citations omitted).  In this case, the only relevant mandate in the Orders that remains in effect is the prohibition against Alliance/Tergeo "employing or using the services of Dery, whether directly or indirectly, through trial in this matter."  [Dkt. 59 at 1.]  There is no evidence that Alliance/Tergeo continues to do so; Dery's association with Power Up China has ended and he is now employed by Heneken.  Accordingly there is nothing left to coerce.[35]  Any remedy for civil contempt in this

─────────────────────────

[35] In its reply brief, AMACOR argues that "as a coercive sanction to induce the Defendants' future compliance with Court orders, AMACOR also is seeking a temporal extension of the Court's Orders for the period of time that they violated it."  [Dkt. 593-1 at 21.]  The flaw in that argument is that the sanction must be to coerce compliance with the order that is the subject of the contempt—an "existing court order," *see Lightspeed Media Corp.*, 830 F.3d at 508—not to coerce compliance with court orders that might be entered in the future.  Such a sanction would be for deterrence, not coercion; it would be for the purpose of deterring Defendants from violating court orders in the future.  A sanction entered for the purpose of deterrence is appropriate for criminal contempt, but not civil contempt.  *See id.* ("[C]ontempt is criminal 'if its purpose is to punish the contemnor, vindicate the court's authority, or deter future conduct.'") (quoting *United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001)).

case must therefore be remedial; that is, it must compensate AMACOR for injury it sustained as a result of the contempt.

Disgorgement of the compensation of Dery, Gagnon, and Fournier would not serve the purpose of compensating AMACOR.  What they were paid bears no relation to any harm suffered by AMACOR.  All of the cases cited by AMACOR for the proposition that disgorgement is an appropriate remedy for civil contempt are inapposite.  The first case cited in AMACOR's brief, *Buffalo Wings Factory, Inc. v. Mohd,* 574 F. Supp. 2d 574 (E.D. Va. 2008), demonstrates why.  In that case, the court found that the defendant violated a consent order in various ways, all of which related to the plaintiff's claims of trademark violation.  The court found that disgorgement of defendant's revenues derived from its contempt—that is, its continued infringement of plaintiff's trademarks in violation of the consent order—was an appropriate remedy for civil contempt because "[r]ecovery of wrongful revenues or net profits earned from infringing activity are well-settled remedies **for trademark infringement** and, specifically, a civil contempt remedy for violation of **trademark** consent orders " *Id.* at 581 (emphasis added).  All of the other cases cited by AMACOR in its briefs on this issue (*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.* 885 F.2d 1 (2d Cir. 1989); *Abbott Labs. v. Unlimited Beverages, Inc.,* 218 F.3d 1238 (11th Cir. 2000); *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 2007 WL 2982295 (S.D.N.Y. Oct. 10, 2007)) are trademark or trade dress cases.  The additional case AMACOR cited in its closing argument, *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448 (1932), is a patent case; in that case, the Court noted that "[i]n a suit in equity against [a patent] infringer, profits are recoverable not by way of punishment but to insure full compensation to the party injured."  In other words, in each of the cases cited by AMACOR, the contempt involved continued trademark or patent violations.  It

34

follows, then, that the appropriate measure of damages for the contempt would be the same as the proper measure of damages for a trademark or patent violation.

This case does involve an allegation of misappropriation of trade secrets, for which disgorgement is perhaps an appropriate remedy. The Undersigned need not decide whether that is the case, however, because, while the Orders did include prohibitions against "using or disclosing trade secrets, confidential information or proprietary information of AMACOR's," [Dkt. 59 at 2]; *see also* [Dkt. 28 at 2], AMACOR's contempt motion does not allege any violation of those provisions. Therefore, the proper measure of damages in a trade secrets case is irrelevant. The amount of compensation received by Dery, Gagnon, and Fournier is simply not a proper measure of any injury that the contempt caused AMACOR. Accordingly, the Undersigned finds that AMACOR has not demonstrated that disgorgement is a proper remedial sanction in this case.

Neither are default judgments or the extension of the terms of the Agreed Injunction.[36] Those remedies would certainly punish Alliance/Tergeo and Dery, but they, like disgorgement, are unrelated to any injury caused by the contempt.[37] Again, the merits of this case are based on

---

[36] In no event would the extension of the Agreed Standstill Order be appropriate, as it was superseded by the entry of the Agreed Injunction. *See* [Dkt. 59 at 2] ("This Order supersedes the Agreed Stand Still Order entered by this Court on September 4, 2020.").

[37] In addition to civil contempt sanctions, the Court has authority to issue sanctions pursuant to its inherent authority for violations of its Orders, and those sanctions are not limited to remedial or coercive sanctions and could include default judgment. *See, e.,g.*, *Fuery v. City of Chicago*, 900 F.3d 450, 463 (7th Cir. 2018) ("A district court may impose sanctions under its inherent authority" based on "a finding of bad faith, designed to obstruct the judicial process, or a violation of a court order.") (citation and quotation marks omitted). The consideration of such sanctions is outside of the Order of Reference; however, the Undersigned notes that they are certainly available to the District Judge if he finds them to be appropriate based upon the factual findings herein.

allegations of the improper use of AMACOR's confidential information; the civil contempt finding is not.  At most, the violations of the Orders sped up Alliance/Tergeo's entry into the secondary magnesium market; any injury to AMACOR from the civil contempt must therefore be based on the injury AMACOR suffered because of Alliance/Tergeo's earlier entry into the market.[38]  But there is no evidence from which the Undersigned could determine how much of an effect the violations actually had on Alliance/Tergeo's ability to enter the market or how much any earlier entry injured AMACOR.[39]

---

[38] The facts of this case are therefore distinguishable from *Dep't of Fair Emp. & Hous. v. L. Sch. Admission Council Inc.*, No. 12-cv-01830-JCS, 2018 WL 1156605, at *23 (N.D. Cal. Mar. 5, 2018), a case cited by AMACOR.  That case involved the violation of a consent decree pursuant to which the defendant was required to take various actions for a period of four years.  After defendant violated some of the terms of the consent decree, the court found it in civil contempt and changed the term of the decree from four years to six years.  The court found that remedy to be appropriate because it "'return[ed] [the moving parties] as nearly as possible to the position they would have occupied had [the contemnor] not violated the agreement.'" *Id.* at *25 (quoting *Kelly v. Wengler*, 822 F.3d 1085, 1097 (9th Cir. 2016)).  "Having ordered a particular period of compliance and determined that the contemnor failed to provide such compliance, a court gives effect to its previous order by extending the term of the decree to account for the time that the contemnor failed to comply." *Id.*  Here, AMACOR's requested remedy would not be **extending** the term of the Agreed Injunction, it would be **reinstating** it long after it expired and long after Alliance/Tergeo entered the secondary magnesium market, causing a disruption of Alliance/Tergeo's business operations and a benefit to AMACOR (removal of a competitor from the market) far beyond what was contemplated when the terms of the injunction were agreed upon.

[39] AMACOR cites *Get In Shape Franchise, Inc. v. TFL Fishers, LLC*, No. 1:16-cv-1374-RLY-DKL, 2016 WL 9274929, at *1 (S.D. Ind. Nov. 16, 2016), *report and recommendation adopted,* No. 1:16-cv-1374-RLY-DKL, 2017 WL 1243116 (S.D. Ind. Apr. 5, 2017), as an example of a court extending an injunction as a civil contempt remedy.  It is true that in that case a preliminary injunction that prohibited the defendant from operating or assisting a particular business until July 1, 2017, was extended to January 1, 2018, as a civil contempt sanction for violating the injunction.  However, there was no discussion of why that remedy was appropriate in that case by either the court or the parties.

We are left, then, with an award of fees and costs to AMACOR, which is an appropriate remedial sanction for the civil contempt in this case.[40]  The Undersigned finds that AMACOR is entitled to an award of fees and costs for the briefing of its original motion for contempt, the briefing of the instant motion for contempt, all discovery related to those motions, the preparation for and participation in the hearing on the instant motion, and the preparation and litigation of its fee motion.[41]  The Undersigned finds that Alliance/Tergeo, Gagnon, Fournier, and Dery should be jointly and severally liable for the fees and costs awarded.

Finally, because an award of fees and costs is not sufficient to punish Alliance/Tergeo, Gagnon, Fournier, and Dery for their willful violation of the Orders, "to vindicate the court's authority" and to "deter future conduct," *see Lightspeed Media Corp.*, 830 F.3d at 508, the Undersigned finds that a referral for criminal contempt proceedings for each of them pursuant to Federal Rule of Criminal Procedure 42 is appropriate.  Such a referral is particularly appropriate in light of the fact that Alliance/Tergeo (through Gagnon and Fournier) and Dery agreed to the entry of the Orders knowing that they did not intend to comply with them, as well as the untruthful and misleading testimony, noted above, that was given during the hearing on the instant motion.

---

[40] AMACOR also asked in its closing argument for an order requiring Alliance/Tergeo to publish this Order in two trade journals.  [Dkt. 727 at 33.]  That request was made to ensure that the industry was aware of any extension of the injunction in this case.  Because the Undersigned is not recommending an extension of the injunction, that request need not be considered.

[41] The Undersigned finds that 75% of the hearing was related to the instant motion; the remaining 25% was related to AMACOR's spoliation motion, which is resolved by a separate Order.

## VI.  Conclusion

For the reasons set forth above, the Undersigned **RECOMMENDS** that Plaintiff's

Renewed Motion to Hold All Defendants and Alliance Principals Michel Gagnon and Joel

Fournier in Contempt of Court be **DENIED** as to Defendant Wogen and **GRANTED** as to

Alliance/Tergeo, Gagnon, Fournier, and Dery.  The Undersigned further **RECOMMENDS** that

Alliance/Tergeo, Gagnon, Fournier, and Dery be referred for criminal contempt proceedings.

Finally, the Undersigned **RECOMMENDS** that AMACOR be awarded its fees and costs for the

briefing of its original motion for contempt, the briefing of the instant motion for contempt, all

discovery related to those motions, the preparation for and participation in the hearing on the

instant motion, and the preparation and litigation of its fee motion; that Alliance/Tergeo,

Gagnon, Fournier, and Dery be held jointly and severally liable for the fees and costs awarded;

that the parties be directed to confer and attempt to agree on an appropriate fee award; and that if

they are unable to do so, that AMACOR be given a deadline for filing a fee petition with

appropriate documentation.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with

the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to

timely file objections within fourteen days after service of this Report and Recommendation

shall constitute a waiver of subsequent review absent a showing of good cause for such failure.


SO ORDERED.


Dated:  8 SEP 2023

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

38

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.