UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ADVANCED MAGNESIUM ALLOYS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:20-cv-02247-RLY-MJD |
| ALAIN DERY, et al., | ) ) | |
| Defendants. | ) ) | |

**REPORT AND RECOMMENDATION REGARDING PLAINTIFF'S MOTION FOR
SANCTIONS FOR SPOLIATION AGAINST DEFENDANTS
ALAIN DERY AND ALLIANCE MAGNESIUM, INC.**

This matter is before the Court on Plaintiff's Motion for Sanctions for Spoliation Against

Defendants Alain Dery and Alliance Magnesium, Inc. [Dkt. 448.] On May 30, 2023, District

Judge Richard L. Young designated the undersigned Magistrate Judge to issue a report and

recommendation regarding the disposition of the motion pursuant to 28 U.S.C. § 636(b)(1)(B).

[Dkt. 687.] The Undersigned held an evidentiary hearing on the motion on July 12, 2023, July

13, 2023, July 14, 2023, and July 31, 2023, and heard the parties' closing arguments on August 3,

2023. Having considered the evidence and arguments presented at the hearing, as well as the

parties' briefs, the Undersigned hereby **RECOMMENDS** the following.

### I. Background

This case was filed on August 27, 2020. In a nutshell, Plaintiff Advanced Magnesium

Alloys Corporation, d/b/a AMACOR ("AMACOR") alleged that while Defendant Alain Dery

was employed as AMACOR's Vice President of Sales and Marketing, he conspired with

Defendant Alliance Magnesium Inc., now d/b/a Tergeo Critical Minerals Inc. (hereinafter

referred to as "Alliance/Tergeo") to "jump start" Alliance/Tergeo's entry into the market for

magnesium recycling using AMACOR's confidential information and trade secrets.

AMACOR terminated Dery's employment on June 8, 2020, after learning that he had

been assisting Alliance/Tergeo.  Exhibit 7.[1]  That same day, AMACOR's counsel sent a letter to

Joel Fournier and Michel Gagnon at Alliance/Tergeo, informing them of Dery's termination and

AMACOR's reasons for it, which were that a forensic examination of Dery's work computer

> found alarming evidence going back to last summer that he in fact had been
> actively providing consulting services to Alliance, using AMACOR knowhow in
> responding to inquiries from various Alliance high-level personnel, including
> both of you personally, in regard to setting up a competing enterprise in
> AMACOR's magnesium recycling niche.  This included, for example, sharing
> with Alliance very sensitive pricing information relating to the purchase of
> magnesium scrap and responding to other requests, such as a financial model that
> Alliance could use.  All of foregoing constitutes smoking gun evidence that Mr.
> Dery was double dealing, ostensibly running AMACOR's sales and marketing
> operations while at the same time assisting Alliance—with Alliance's active
> connivance—in formulating and developing its plans for expansion into the
> secondary magnesium recycling market until presumably Alliance reached the
> stage where it was ready to hire him so that he could assist in further implementing
> his wealth of knowledge about AMACOR's trade secrets for his and Alliance's
> benefit.

Exhibit 4 at 1-2 (hereinafter referred to as the "AMACOR Letter").  The AMACOR Letter

further advised Alliance/Tergeo to "immediately take all steps necessary to identify, retain, and

preserve all data in your possession or under your control, including electronic data, that pertains

[to] the matters referenced in this letter."  *Id.* at 3.

---

[1] All citations to exhibits herein are to exhibits that were admitted into evidence during the
evidentiary hearing.  Many of the relevant documents in this case are in French; the citations
herein are to the certified English translations of the French documents.

The following day, AMACOR's counsel sent a letter to Dery, memorializing the circumstances of Dery's termination and similarly advising Dery to preserve all information "that pertains to [AMACOR] or your dealings with Alliance."  Exhibit 7 (hereinafter referred to as the "Termination Letter").  The Termination Letter elaborated as follows:

> To be clear, such data includes not only paper copies, but also emails, text messages, social media posts and other electronic documents, as well as backed-up, deleted, hidden, or orphaned data.  It also includes storage media (e.g., USB external storage devices, disks and backup tapes); all word-processed files, including drafts and revisions and metadata; all spreadsheets, including drafts and revisions; all databases; all data generated by calendaring, task management and Personal Information Management software (such as Microsoft Outlook Notes); and all data created with the use of I-Phones or similar devices.  **Failure to do so in light of this advisory may constitute spoliation of evidence or have other adverse consequences for you.**
>
> You must act quickly to preserve this information.  The continued operation of computer systems may overwrite data resident on servers and hard drives, including discoverable data that is invisible to the operating system.  Thus, all relevant data must be safeguarded from destruction for any reason, including but not limited to backup, restoration, deletion, destruction, and recycling.

*Id.* at 2 (emphasis in original).  The AMACOR Letter contained virtually identical language. Exhibit 4 at 3.

In the instant motion, AMACOR alleges that Dery and Alliance/Tergeo spoliated various evidence that should have been preserved pursuant to the Termination Letter and the AMACOR Letter and produced in response to AMACOR's discovery requests in this case.

## II.  Relevant Contempt Findings

In addition to the instant ruling, the Undersigned is also issuing this date a Report and Recommendation regarding AMACOR's motion for contempt ("Contempt R&R").  All of the findings in the Contempt R&R are incorporated herein.  The Undersigned highlights the following findings, which are of particular relevance to the instant motion.

First, as set out in detail in the Contempt R&R, the Undersigned finds that in July 2020, after Dery was terminated by Alliance/Tergeo, and just prior to the filing of this lawsuit, Alliance/Tergeo, through Gagnon and Fournier, implemented a plan by which Dery would continue assisting Alliance/Tergeo without directly working for Alliance/Tergeo. This plan involved Dery ostensibly working for a company called Power Up China, which is owned by Jean Deragon, while actually working for Alliance/Tergeo. The Undersigned further finds that Fournier, Gagnon, and Dery conspired to conceal the fact that Dery was assisting Alliance/Tergeo through Power Up China and to avoid leaving a paper (or digital) trail regarding that fact. This included avoiding using Dery's name in written communications, sometimes referring to him as "Mr. X." It also included Dery using email addresses, some of which were newly created, that did not include his name, purchasing a Motorola cell phone to use to communicate with Alliance employees and Deragon, and communicating with Gagnon through Gagnon's wife rather than directly. As discussed below, the Undersigned finds that Alliance and Dery spoliated evidence in a further attempt to keep discoverable information from AMACOR.

### III. Applicable Law

AMACOR asserts both federal and Indiana state law claims in this case. Thus, the first question is whether federal or Indiana spoliation law, which differ in significant ways, should be applied. None of the parties adequately address this issue. However, inasmuch as all of the parties apply federal law in their briefs, the Undersigned will do so as well. [2] *See Div. Six Sports,*

---

[2] AMACOR raises the issue of choice of law for the first time in its reply brief, stating that "[g]iven that the present case is primarily a diversity case (albeit with one claim grounded in federal law), arguably the Indiana standard—that does not require intentional or bad faith spoliation if it results in prejudice—may apply here." [Dkt. 552 at 12 n.3.] This bare statement

*Inc. v. Finish Line, Inc.*, 928 F.3d 631, 635 (7th Cir. 2019) ("The parties agree the contract is

governed by Indiana law, so we need not examine the choice-of-law question further." (citing

*Wood v. Mid-Valley Inc.*, 942 F.2d 425, 427 (7th Cir. 1991)); *see also Speakers of Sport, Inc. v.

ProServ, Inc.*, 178 F.3d 862, 864 (7th Cir. 1999) ("The parties agree that the substantive issues in

this diversity suit are governed by Illinois law, and we do not look behind such agreements so

long as they are reasonable, as this one is.") (citing *Spinozzi v. ITT Sheraton Corp.*, 174 F.3d

842, 849 (7th Cir. 1999)).

All of the alleged spoliated evidence at issue in the instant motion consists of

electronically stored information.  Spoliation of electronically stored information is addressed by

Federal Rule of Civil Procedure 37(e),[3] which provides:

> If electronically stored information that should have been preserved in the
> anticipation or conduct of litigation is lost because a party failed to take reasonable
> steps to preserve it, and it cannot be restored or replaced through additional
> discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may
> order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party
> of the information's use in the litigation may:
>
> (A) presume that the lost information was unfavorable to the party;

---

does not change the fact that the parties all implicitly agreed that federal law applies, given their reliance on it in their briefs.

[3] In further support of applying federal, not state, law, the Undersigned notes that the Advisory Committee Note to Federal Rule of Civil Procedure 37 states that it "forecloses reliance on inherent authority or state law to determine when certain measures should be used" to address spoliation of electronically stored information.  *See also Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 617 (N.D. Ill. 2022) ("Rule 37(e) provides the sole source to address the loss of relevant ESI that was required to be preserved but was not because reasonable steps were not taken, resulting in prejudice to the opposing party.") (citing *DR Distributors v. 21 Century Smoking*, 513 F. Supp. 3d 839, 956 (N.D. Ill. 2021)).

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or
(C) dismiss the action or enter a default judgment.

The applicable burden of proof is preponderance of the evidence. *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 777 (7th Cir. 2016).

### IV.  Dery's Spoliation of Evidence

AMACOR alleges that Dery spoliated evidence in three ways after AMACOR sent him the Termination Letter.[4]  The evidence and findings regarding each of these allegations are set forth below.

### A.  Dery's External Drives

A forensic examination of Dery's laptop conducted after his termination by AMACOR determined that Dery had attached seven different external hard drives and flash drives to his laptop between April 17, 2020, and June 11, 2020.  Exhibit 56.  One of those devices was a Seagate backup portable hard drive (the "Seagate Drive") that Dery purchased on April 7, 2020, one month after he signed an employment agreement with Alliance/Tergeo.  [Dkt. 704 at 22.]  It is undisputed that Dery downloaded AMACOR's "shared folder," along with the rest of the contents of Dery's personal cloud account, onto the Seagate Drive.  *Id.*  The shared folder contained confidential AMACOR information regarding its sales and marketing, including records of customer calls, AMACOR sales agreements, requests for quotes, and customer visit reports.  *Id.* at 23-24.  Dery concedes that some of the AMACOR information would have been

---

[4] Dery and Alliance/Tergeo do not dispute that once they received the Termination Letter and the AMACOR Letter they had a duty to preserve evidence, including electronically stored information, because litigation clearly was anticipated at that time.

useful to Alliance/Tergeo.  *Id.* at 39.  Dery downloaded his entire cloud, including the AMACOR

shared folder, onto two other hard drives and a USB drive as well.  *Id.* at 26-27.

Of the seven devices identified in the forensic examination, only three of them were

produced by Dery in discovery.  The Seagate Drive was not produced; nor was a USB Flash

Drive ("USB Drive"), a WD My Passport Device ("Passport Drive"), and a PF i-FlashDrive Max

("PF Drive").  Exhibit 56.  When asked at the hearing whether the USB drive contained

AMACOR information, Dery was evasive, stating:  "Well, listen.  It is an excellent question

because clearly it is an external drive."  [Dkt. 704 at 28.]  When asked the same question about

the PF Drive, Dery answered:

> Listen, Mr. Barr, I remember checking all of the devices that I owned and checked
> that, whether or not they contained AMACOR information.  And if they did, I
> supplied everything.  I am absolutely certain of that.

*Id.* at 29.  However, at his deposition, Dery testified that he was unable to find the two external

drives and the two USB external drives.  *Id.*  When confronted with that testimony at the hearing,

Dery conceded that "if that is what I answered then, when we were closer in time to the facts, I

am certain that that was the case."  *Id.*  When confronted with additional deposition testimony,

Dery further conceded that he had downloaded his entire personal cloud, including the

AMACOR information, onto each of those drives.  *Id.* at 30.  Dery later tried to walk that back,

testifying that "the backups of the iCloud were all done on external hard drives, not on thumb

drives" and that the USB Drive must not have included any AMACOR documents as of June 9,

2020, "[b]ecause I researched all of the documents and all the devices and all the peripheral

devices that I had."  [Dkt. 723 at 74.]  So, despite his testimony at his October 28, 2022,

deposition that the USB Drive would have included AMACOR documents, such as "files that I

was working on during the day that I might bring home at night to continue working on," his

testimony at the hearing was that "clearly after I checked the USB drive on the 9th of June, there wasn't that information on it." *Id.* at 95.

Dery testified that he understood his obligation pursuant to the Termination Letter to preserve "all external storage media, including hard drives," as well as e-mails, text messages, and phones. [Dkt. 704 at 32.] He further testified that he set aside certain devices to ensure that they were preserved as evidence. *Id.* at 34. However, he failed to set aside the four devices at issue. *Id.* at 36. Dery has no explanation for why he failed to do so, and he testified that he is unsure what happened to the devices. He surmises that they were thrown away or recycled while he was moving residences in June 2020. *Id.* at 37-39.

The Undersigned finds that Dery intentionally failed to preserve—or, perhaps, simply refused to produce—the Seagate Drive, the USB Drive, the Passport Drive, and the PF Drive. Dery had used each of the devices shortly before he received the Termination Letter;[5] this is not a situation in which an unused device was stuck in a drawer and forgotten about. The Undersigned further finds that Dery failed to preserve the devices so that the information contained on them would not be available to AMACOR to use in this litigation. This finding is based on the evasiveness of Dery's testimony at the hearing, the inconsistencies between his deposition testimony and his hearing testimony, and the lack of a plausible explanation for why he failed to set the devices aside so that they would be preserved and produced to AMACOR. Also relevant to this finding, and all of the findings of spoliation herein, are the other actions that

---

[5] The Termination Letter was sent on June 9, 2020. Dery had last used the Seagate Drive on May 14, 2020, the Passport Drive on May 10, 2020, and the PF Drive on April 17, 2020. Exhibit 56. He used the USB Drive on June 11, 2020, after he received the Termination Letter. *Id.*

were taken by Dery, in conjunction with Alliance/Tergeo, to attempt to hide evidence from

AMACOR.

Dery's use of AMACOR's information, which Dery conceded was contained on the

devices at issue, is the core issue in this case.  While it is impossible to know exactly what

evidence could have been gleaned from the devices had they not been spoliated, as AMACOR

explains in its reply brief:

> If he had the missing devices, the forensics expert might have been
> able to determine when and whether those also were connected to
> computers, and what dates. This information could prove Dery
> shared the documents on the storage drives with others:   AMACOR
> could cross-reference the date of the device connection with key
> meetings between Dery and Alliance, Deragon, Wogen, or others to
> prove who the information was being shared with.  As well, even
> limited metadata would show Dery accessing the files, and altering
> them, as they would show "Last Accesses Date" or "Last Modified
> Date."

[Dkt. 552 at 14.]  There is simply no question that Dery should have preserved the four devices

and that there is no other way for AMACOR to obtain whatever useful evidence could have been

retrieved from them.

**B.  Dery's Motorola Phone**

At the end of June or beginning of July 2020, Dery purchased a Motorola mobile phone.

[Dkt. 723 at 5.]  The phone was added to an account that was in Dery's wife's name; that account

also included the family's home internet and television services.  *Id.*  Prior to that time, he had

used an iPhone; he continued to use the iPhone regularly after he purchased the Motorola phone,

but began to use the Motorola phone as well.  In July through November 2020, Dery used the

Motorola phone mainly to communicate with employees of Alliance/Tergeo, with Jean Deragon

of Power Up China, and with Caroline Verreault, who was Gagnon's wife, both via text messages and calls.  *Id.* at 7-13; 42-43; Exhibit 93.

Despite the fact that the calls and texts on the Motorola phone were clearly relevant to the issues in this case, and despite the fact that Dery purchased the Motorola phone **after** he received the Termination Letter, which included the document preservation instructions, Dery took no steps to preserve any of the information on the Motorola phone.  [Dkt. 723 at 15.]  Rather, Dery testified that he "assumed that all of the information on it was backed up as had always been the case with my other phones."  *Id.* at 14-15.  In fact, the Motorola phone was not backed up.

Dery did not disclose the existence of the Motorola phone in his October 2020 discovery responses, despite the fact that Document Request 23 sought "all cell phones" and "access to all cloud accounts."[6]  Dery testified that his "understanding was that I had provided all devices that dated to the time I worked for AMACOR," [Dkt. 723 at 16], in his October 2020 discovery requests, but the request is not so limited and his response to the request does not indicate that it is limited in time.[7]  Exhibit 45.  Dery also did not disclose the existence of the Motorola phone in his December 2020 interrogatory responses, even though Interrogatory No. 8 required him to identify "all . . . cell phones . . . used by You from January 1, 2018, to the present."  Exhibit 63. He failed to disclose the Motorola phone despite the fact that he had used it to place a call just a

---

[6] Although apparently there was no cloud account associated with the Motorola phone, Dery's testimony is that he believed that there was.  Therefore, he should have checked for such an account when responding to this document request.

[7] The Undersigned recognizes that Dery's general objections to the requests include the statement that he "objects to the chronological scope of any request for information dating from time periods not relevant to this litigation," Exhibit 45 at 2, but that vague and general objection did not excuse Dery from producing the Motorola phone or indicating that he was withholding it based on the general objection.  *See* Fed. R. Civ. P. 34(b)(2)(C) ("An objection must state whether any responsive materials are being withheld on the basis of that objection.").

week prior to signing the interrogatory responses, [Dkt. 723 at 18], and had used the phone to make a five minute call to Verreault's phone number just two months earlier, Exhibit 93.

Dery did not reveal the existence of the Motorola phone to his counsel until March 2021. [Dkt. 723 at 18.] At that time, he made arrangements with his counsel to turn the phone over to a company in Montreal for forensic imaging. Dery testified that he traveled to Montreal, which was two to three hours from his home, in March 2021, and that he took the Motorola phone with him so he could turn it over to the forensic company. *Id.* at 21. While in Montreal, he had dinner in Chinatown and took the Motorola phone with him to the restaurant. *Id.* Dery has no explanation for why he took the Motorola phone with him to the restaurant, as he was not using it regularly at that time and was not planning to use it that evening. *Id.* He also took his iPhone to the restaurant, which was the phone he was using regularly at that time. *Id.* at 22. Dery testified that he accidentally left the Motorola phone at the restaurant. *Id.* at 22. He further testified that he returned to the restaurant a few hours later to see if it had been found, but it was not there. *Id.* at 22-23; 76. Upon further questioning, Dery admitted that the restaurant was closed when he went back the same night, a fact that he had previously omitted, but then testified for the first time that that he went back to the restaurant a third time when it was open, he believes the next day. *Id.* at 99.

The day after he left the phone at the restaurant, Dery purchased a new Motorola phone to replace the one that had been "lost." That phone had the same phone number, and Dery testified that he "asked [the sales associate] if the new telephone would be identical to the old one, and they told me yes." *Id.* at 24. In fact, it was not identical, in that the new phone contained no data from the old phone: no text messages, no call logs, etc. Dery testified that he did not check the new phone to see if it contained that data before he turned it over to the

forensic company for imaging.  *Id.*  As a result, the forensic imaging revealed a blank phone.  *Id.* at 25.  Dery never used the Motorola phone again after it was returned to him by the imaging company.  *Id.* at 26.

Dery did not disclose the fact that he lost and replaced his Motorola phone, even though he amended his interrogatory response approximately a week later to include, for the first time, that he had used two cell phones.  Exhibit 70 at 14.  Dery testified that he did not do so because, "[a]s far as I was concerned, the replacement phone was exactly the same phone as the original Motorola phone."  [Dkt. 723 at 26.]  AMACOR did not learn that there had been two Motorola phones until August 2022.  *Id.* at 27.  At that time, AMACOR realized that there were text messages contained on Dery's phone bills that had not been produced and inquired about them.

The Undersigned finds that Dery intentionally spoliated the data on the Motorola phone so that it would not be turned over to AMACOR for use in this litigation.  This finding is based on the evasiveness of Dery's testimony at the hearing, the inconsistencies between his deposition testimony and his hearing testimony, and the lack of a plausible explanation for why he failed to reveal the existence of the Motorola Phone prior to March 2021 and why he took it with him to the Chinese restaurant.[8]  Perhaps most unbelievable is Dery's claim that he turned over the replacement Motorola phone for forensic examination without noticing that it contained no data whatsoever.

---

[8] Frankly, the Undersigned does not know if Dery actually left the phone at the Chinese restaurant or whether he did something else with it, but the Undersigned finds that the preponderance of the evidence shows that Dery intentionally made sure that the phone (or, more precisely, the data on the phone) was not available to turn over to AMACOR.

12

There is simply no question that the Motorola phone contained evidence that AMACOR is not able to obtain from other sources.  Dery used the Motorola phone to communicate with with Deragon, Alliance/Tergeo employee Remi Belliveau, Fournier, and Gagnon, both directly and through Verreault, his wife.  While the content of some of the text messages between Dery and these individuals have been produced by the other individuals, not all of them have.  At a minimum, as explained in detail below, the content of the text messages between Dery and Verreault's phone are now wholly unavailable.  Dery testified that none of those messages were of any substance, but rather consisted only of his attempts to arrange communications with Gagnon, *see* [Dkt. 723 at 47], but the fact is that AMACOR has been deprived of the ability to confirm that fact by Dery's intentional spoliation.  In addition, the Undersigned notes that the phone records include a five minute telephone call between the Motorola phone and Verreault's phone number; it seems highly unlikely that that phone call was limited to attempting to arrange communication with Gagnon, so there is no reason to believe that all of the text messages were so limited.

### C.  Dery's Emails

On June 9, 2020, the day Dery received the Termination Letter from AMACOR's counsel that included document preservation instructions, Dery provided Gagnon, Fournier, and Belliveau with a new email address to use for all future communications— deaj2566@gmail.com.  Exhibit 5A.  Two days later, Dery texted Gagnon and asked him to have Deragon call him or email him at the email address deal722223@gmail.com.  Exhibit 9A.

Dery provided a forensic company access to various of his email accounts in March 2021.  Among the email accounts he provided was deaj2566@gmail.com.  Only 25 documents were contained in that account at the time of the forensic examination.  Exhibit 95.  At least one

13

email that was sent from that address to Gagnon was not produced by Dery; it was, however, produced by Alliance/Tergeo.  Exhibit 6A.  That email was sent on June 9, 2020.

Dery used another email address, daj427@videotron.ca, to communicate with Alliance/Tergeo and Deragon in 2020.  [Dkt. 723 at 31-32.]  The forensic examination found eighteen documents in that email account.  Exhibit 95.  None of them were dated prior to November 5, 2020, and none were produced to AMACOR, presumably because they were not relevant to this case.  [Dkt. 723 at 33.]  However, Alliance/Tergeo did produce emails that were sent to or from that email address to or from Alliance/Tergeo employees prior to November 2020.  *See, e.g.*, Exhibit 24A, Exhibit 29A, Exhibit 30A.

Finally, despite the fact that Dery asked Deragon to use the email address deal722223@gmail.com to communicate with him, no emails have been produced from that account.  Dery testified that he did not remember that email address and does not believe it ever existed.  [Dkt. 723 at 50.]  He testified that when his attorney asked him about the account, he checked with Google and was informed that the address did not exist.  *Id.* at 34.  He had no explanation for why he would ask Deragon to use a non-existent email address.  *Id.* at 35.

Dery testified that he did not do anything to preserve the emails in his accounts because he "just thought that e-mails always stayed in the account, for forever."  [Dkt. 723 at 31]; *see also id.* at 32.  The Undersigned agrees that emails do not simply disappear from email accounts; nor do email accounts simply disappear.  The Undersigned finds that Dery intentionally deleted emails from deaj2566@gmail.com and daj427@videotron.ca so that they would not be produced in discovery in this case.  The Undersigned further finds that Dery intentionally deleted the deal722223@gmail.com account for the same reason.  As set forth in detail in the Contempt

R&R, the Undersigned also finds that Dery instructed Alliance/Tergeo and Deragon to use these email accounts to communicate with him for the purpose of evading discovery.

Some of the missing emails have been produced by Alliance/Tergeo. However, none of the emails between these accounts and Deragon have been produced. Deragon is not a party to this case, and the Undersigned finds that even if AMACOR were able to successful obtain international non-party discovery from Deragon, there would be no way of knowing that Deragon produced all of the relevant emails, given that Deragon was not under an obligation to preserve the emails. AMACOR was entitled to these emails and has been deprived of them due to Dery's intentional spoliation.

### D. Appropriate Spoliation Sanctions Against Dery

Pursuant to Federal Rule of Civil Procedure 37(e)(2)(C), because the Undersigned has found that Dery spoliated evidence with the intent to deprive AMACOR of the ability to use that evidence in this litigation, the sanction requested by AMACOR, default judgment, is available as a potential sanction.[9] Default judgment is a severe sanction and is not automatically appropriate even when intentional spoliation occurs.

> Courts should exercise caution . . . in using the measures specified in (e)(2). Finding an intent to deprive another party of the lost information's use in the litigation does not require a court to adopt any of the measures listed in

---

[9] As the Advisory Committee Notes to Rule 37 make clear, AMACOR does not have to prove that it was prejudiced by the fact that it was deprived of evidence:

> Subdivision (e)(2) does not include a requirement that the court find prejudice to the party deprived of the information. This is because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position. Subdivision (e)(2) does not require any further finding of prejudice.

15

subdivision (e)(2). The remedy should fit the wrong, and the severe measures authorized by this subdivision should not be used when the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss.

Advisory Committee Notes to Rule 37.

In this case, in light of the multiple instances of intentional spoliation by Dery, which evidences a concerted effort by Dery to deprive AMACOR of evidence in this case, the Undersigned has no trouble finding that the sanction of default judgment is appropriate. Dery repeatedly flouted his discovery obligations in this case by spoliating evidence. Lesser sanctions simply would not fit the wrong. Indeed, if default judgment against Dery is not warranted on these facts, it is not clear when it ever would be. Accordingly, the Undersigned **RECOMMENDS** that default judgment be entered against Dery in this case as a sanction for his spoliation of evidence. The Undersigned further **RECOMMENDS** that AMACOR be awarded the attorneys' fees and costs it expended as a result of the spoliation, which includes the briefing of the instant motion, the preparation for and participation in the hearing on the instant motion,[10] and all discovery efforts that were required as a result of the spoliation of evidence.

### V. Alliance/Tergeo's Spoliation of Evidence

AMACOR alleges that Alliance/Tergeo spoliated evidence from a cell phone owned by Gagnon's wife, Caroline Verreault.[11] Beginning in July 2020, Gagnon sometimes communicated

---

[10] The Undersigned finds that 25% of the hearing was related to the spoliation issue; the remaining 75% was related to the contempt motion.

[11] AMACOR also introduced evidence during the hearing that showed that Alliance/Tergeo created an email address for Dery in anticipation of him coming to work for Alliance/Tergeo, but instructed its IT vendor on June 23, 2020, to delete that account and "everything contained within it." [Dkt. 723 at 126-27.] While the Undersigned questions the propriety of deleting that account—even if, as Alliance/Tergeo contends, it was never used—the account's destruction was not raised in the instant motion as an alleged act of spoliation by Alliance/Tergeo.

16

with Dery indirectly, through Verreault.[12]  [Exhibit 93.]  Specifically, Verreault—who had never

met Dery—would communicate with Dery using her cell phone, which had been issued to her by

her employer, Deloitte Canada.  The number Verreault would receive messages from and

respond to was not Dery's usual mobile phone number, but rather the number of the Motorola

phone discussed above.  The Undersigned finds that this convoluted system[13] was a means of

avoiding creating a paper (or digital) trail that would reveal the ongoing work Dery was

performing for Alliance/Tergeo.

The text messages between Verreault's phone and Dery were not preserved by

Alliance/Tergeo, and AMACOR did not learn of them until 2022.  Prior to that time,

Alliance/Tergeo had responded to AMACOR's Interrogatory Number 2, which sought

information about all communications between Alliance/Tergeo[14] and Dery, numerous times

without disclosing the communications.  *See* Exhibit 64 (Alliance/Tergeo's initial interrogatory

responses); Exhibit 67 (Alliance/Tergeo's supplemental interrogatory responses); Exhibit 69

(Alliance/Tergeo's second supplemental interrogatory responses); and Exhibit 75

(Alliance/Tergeo's fourth supplemental interrogatory responses).  Gagnon's insistence that he did

not disclose the communications involving his wife because he did not recall that those

---

[12] Gagnon also sometimes communicated directly with Dery during the same time period.  *See* Exhibit 93.  Those direct communications were disclosed during discovery.  [Dkt. 703 at 34.]
[13] For example, on August 12, 2020, Gagnon texted his wife and asked her to text "Alain" because Gagnon had "just tried to reach [him]."  Exhibit 23A.  Gagnon had no satisfactory response when it was pointed out to him that he "could have texted Alain Dery in the same time it took you to send this text to your wife."  [Dkt. 703 at 55.]
[14] Given the definitions in the interrogatories, there is no question that Verreault's communications with Dery on Gagnon's behalf should have been disclosed by Alliance/Tergeo.

communications occurred, [Dkt. 702 at 186, Dkt. 703 at 31], is not credible.[15]  AMACOR served

its interrogatories on October 2, 2020, which was just two days after a text exchange between

Dery and Gagnon's wife's phone occurred; numerous texts and calls between the two numbers,

including a five-minute phone call, occurred after the interrogatories were served.  *See* Exhibit

93.  Given the unusual circumstance[16] of routing business-related communications through his

wife—a person who did not work for Alliance/Tergeo and, in fact, had her own career—it is

simply not credible that in such a short time period Gagnon would "forget" all about those

communications.[17]

        The Undersigned finds that Gagnon, and therefore Alliance/Tergeo, intentionally failed to

reveal the communications involving his wife until AMACOR learned about them.  By that time,

the content of the communications could not be retrieved because Verreault had broken her

phone and it had been replaced by her employer.  At that time, all of the text messages on the

phone were deleted per her employer's policy.  The Undersigned does not find that the phone

was intentionally destroyed or that Alliance/Tergeo orchestrated the loss of the content of the

phone in any way.  However, the cause of AMACOR's inability to obtain information from the

phone is Gagnon's intentional failure to identify those communications and preserve them at the

time he became obligated to do so, when the AMACOR Letter was received.  If Gagnon—who

---

[15] Gagnon testified that he did not remember the text messages because he did not receive them, so "there was no way for me to know."  [Dkt. 703 at 31.]  However, he also testified that this wife was "very meticulous" and would always pass messages along to him, *id.* at 84, so he clearly was aware of each message that Dery sent to Verreault's phone.

[16] Gagnon himself described it as an "exceptional situation."  [Dkt. 703 at 83.]

[17] The Undersigned notes that, when asked on cross-examination whether his wife "act[ed] in that capacity for you as a de facto assistant or secretary before the summer or fall of 2020," Gagnon did not actually answer the question.  Instead, his response was:  "Well, quite simply, she was my spouse, and she helped me."  [Dkt. 703 at 28.]

18

was Alliance/Tergeo's CEO at the time—had fulfilled his obligation to preserve electronically

stored information, the information from Verreault's cell phone would not have been lost.

Therefore, the Undersigned finds that Alliance/Tergeo, through Gagnon, spoliated the text

messages between Verreault's phone and Dery.  The Undersigned further finds that Gagnon

failed to reveal the existence of the text messages in order to keep them from being produced to

AMACOR in discovery; accordingly, Alliance/Tergeo, through Gagnon, "acted with the intent to

deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2).   This

finding is based on the evasiveness of Gagnon's testimony at the hearing, the lack of a plausible

explanation for why Dery would need to communicate with Gagnon through his wife when no

one else did so, and the other actions that were taken by Gagnon, in conjunction with Dery and

Fournier, to attempt to hide evidence from AMACOR.

In its briefs in support of the instant motion, AMACOR does not ask for the sanction of

default judgment to be entered against Alliance/Tergeo for its spoliation.  Instead, AMACOR

asks for

> an adverse instruction against Alliance that the jury may conclude that the deleted
> content in the communications between Dery and Verreault would have shown
> evidence of Dery's collaboration with Alliance to source magnesium scrap for
> Alliance's operation through Power Up China as intermediary and otherwise
> assisted Alliance; that this continued through the period of the injunctions barring
> Dery and Alliance from working together; and that the content of the
> communications between Dery and Verreault would have shown evidence that
> Dery used AMACOR confidential information and trade secrets to benefit
> Alliance.

[Dkt. 451 at 36.] The Undersigned finds that an adverse inference instruction against

Alliance/Tergeo is warranted in this case.  Alliance/Tergeo, through Gagnon, intentionally

created a means of communication with Dery that was not likely to be discovered by AMACOR

in the course of discovery and then intentionally did not reveal those communications in its

discovery responses.[18]  It is wholly appropriate for the jury to be advised of that fact and told that it may presume that the deleted electronic information would have been unfavorable to Alliance/Tergeo.

That said, AMACOR submits no authority for the type of specific instruction it seeks. The Federal Civil Jury Instructions of the Seventh Circuit do not contemplate such a specific instruction, but rather contemplate only that the jury be instructed generally that evidence that was intentionally spoliated in bad faith may be assumed to have been unfavorable to the spoliating party.  *See*  Instruction 1.20, Spoliation/Destruction of Evidence, https://www.ca7.uscourts.gov/pattern-jury-instructions/7th_cir_civil_instructions.pdf (last visited August 30, 2023).

The Undersigned **RECOMMENDS** that Alliance/Tergeo be sanctioned for spoliation by an adverse inference instruction at trial.  The exact content of that instruction should be determined by Judge Young after further briefing on the issue by the parties.  The Undersigned further **RECOMMENDS** that Alliance/Tergeo be jointly and severally liable with Dery for

---

[18] Alliance/Tergeo argued in its closing argument that Alliance/Tergeo had no duty to obtain and turn over the information on Verreault's phone because the phone was "owned by a nonparty, [Deloitte].  The phone was never Alliance's property.  It was never even [Verreault's] property. Alliance never had any legal right to obtain text messages form a Deloitte-Canada-owned phone; and therefore, never had any control over the phone."  [Dkt. 727 at 77.]  The Undersigned does not find that argument persuasive; if Gagnon had the ability to recruit Verreault to use her work phone to aid him in his work for Alliance/Tergeo, Gagnon certainly had the ability to obtain messages from that work phone simply by asking Verreault for them.  However, regardless of the merits of Alliance/Tergeo's argument, it wholly ignores that fact that Gagnon knew about the use of Verreault's phone and arranged for the phone to be used as a means for him to communicate with Dery, and yet Alliance/Tergeo failed to reveal the existence of those communications in its interrogatory responses time and time again.  Had it done so before the phone was broken, AMACOR could have pursued the messages through non-party discovery if, in fact, Alliance/Tergeo demonstrated that it was not required to produce them itself.

AMACOR's attorneys' fees and costs it expended as a result of the spoliation, which include the briefing of the instant motion, the preparation for and participation in the hearing on the instant motion, and all discovery efforts that were required as a result of the spoliation of evidence.

### VI.  Conclusion

For the reasons set forth above, the Undersigned **RECOMMENDS** that AMACOR's Motion for Sanctions for Spoliation Against Defendants Alain Dery and Alliance Magnesium, Inc., [Dkt. 448], be **GRANTED**.  The Undersigned further **RECOMMENDS** that default judgment be entered against Dery in this case as a sanction for spoliation of evidence and that Alliance/Tergeo be sanctioned for spoliation by an adverse inference instruction at trial.  The Undersigned further **RECOMMENDS** that AMACOR be awarded the attorneys' fees and costs it expended as a result of the spoliation, which include the briefing of the instant motion, the preparation for and participation in the hearing on the instant motion, and all discovery efforts that were required as a result of the spoliation of evidence; that Dery and Alliance/Tergeo be jointly and severally liable for that award of fees and costs; that the parties be directed to confer and attempt to agree on an appropriate fee award; and that if they are unable to do so, that AMACOR be given a deadline for filing a fee petition with appropriate documentation.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service of this Report and Recommendation shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

SO ORDERED.

Dated:  8 SEP 2023

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.