UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ADVANCED MAGNESIUM ALLOYS CORPORATION, d/b/a AMACOR, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 1:20-cv-02247-RLY-MJD |
| ALAIN DERY, ALLIANCE MAGNESIUM, INC., now d/b/a TERGEO CRITICAL MINERALS, INC., and WOGEN RESOURCES AMERICA, LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**ENTRY ON OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION REGARDING PLAINTIFF'S RENEWED MOTION FOR CONTEMPT and PLAINTIFF'S MOTION FOR THE COURT TO EXERCISE ITS INHERENT AUTHORITY TO ISSUE ADDITIONAL SANCTIONS, OR ALTERNATIVELY LIMITED OBJECTIONS THERETO**

On September 8, 2023, the Magistrate Judge issued a Report and

Recommendation recommending that Plaintiff's Renewed Motion to Hold All Defendants

and Alliance Principals (and non-parties) Michel Gagnon and Joel Fournier in Contempt

of Court ("R&R") be granted with respect to Alliance Magnesium, Inc., now d/b/a Tergeo

Critical Minerals, Inc. ("Alliance"), Michel Gagnon, Joel Fournier, and Alain Dery and

denied with respect to Wogen Resources America, LLC.  He also recommended that

Alliance, Gagnon, Fournier, and Dery be referred for criminal contempt proceedings.

Lastly, he recommended that Plaintiff Advanced Magnesium Alloys Corporation, d/b/a

AMACOR be awarded its attorneys' fees and costs associated with bringing its original

1

motion for contempt and the renewed motion for contempt, and that Alliance, Gagnon, Fournier, and Dery be held jointly and severally liable for the fees and costs awarded.

Before the court are the objections filed by Alliance and Gagnon, Fournier, and Dery,[1] and AMACOR's motion for additional sanctions and objection to the Magistrate Judge's recommendation regarding Wogen.   For the reasons explained below, their objections are **SUSTAINED in part** and **OVERRULED in part**, and AMACOR's motion for additional sanctions and objection is **GRANTED in part** and **DENIED in part**.

## I.    Background

Plaintiff AMACOR operates a large-scale magnesium recycling business in Anderson, Indiana.  (Filing No. 195 ¶ 13).  In 2016, AMACOR hired Alain Dery, a Canadian citizen, to serve as its Vice President of Sales and Marketing.  (*Id.* ¶¶ 14, 26; Filing No. 704 at 10).  In that capacity, Dery was responsible not only for sales but also magnesium scrap procurement, logistics, shipping, and receiving.  (Filing No. 704 at 14-15).

Defendant Alliance, based in Quebec, Canada, was founded by Fournier.  (Filing No. 195 ¶ 2; Filing No. 723 at 104).  Alliance sought entry into the primary magnesium market but determined that entry into the secondary, or recycled, magnesium market would be its first source of revenue.  (Filing No. 702 at 127–28).  Alliance knew Dery

---

[1] Dery joins in Alliance's Objection and Fournier's Objection.  (Filing No. 758).

worked at AMACOR and that he sourced magnesium scrap, which was then recycled and sold. (*Id.* at 13, 133–34).

On March 1, 2020, an employment agreement was executed between Dery and Alliance officers Fournier and Gagnon, in which Dery agreed to serve as Alliance's Vice President of Business Development. (Ex. 2A[2]). The agreement provided that Dery would be paid $275,000 (CAD) per year, (*id.* ¶ 4.1), which was approximately $18,000 USD per month, (Filing No. 702 at 138). Dery's employment with Alliance would not take effect, however, until "at most two months following the closing of financing." (Ex. 2A ¶ 2.1). Alliance intended to capitalize on Dery's expertise in the scrap procurement business for purposes of its anticipated magnesium recycling business. (Filing No. 702 at 134-35).

AMACOR fired Dery on June 8, 2020, after learning through a forensic examination of his work-provided computer that he had been "providing counselling and information to another company, Alliance Magnesium LLC, in connection with their entry into the magnesium recycling industry in which [AMACOR] competes." (Ex. 7).

That same day, AMACOR's counsel sent a letter to Gagnon and Fournier informing them of Dery's termination and the "smoking gun" evidence of Dery's "double dealing" gleaned through the forensic examination. (Ex. 4). Among other things, AMACOR learned that for the past year, Dery had been "providing consulting services to

---

[2] Citations to the exhibits herein are to exhibits that were admitted during the evidentiary hearing. Some exhibits, including Exhibit 2, are in French. The certified English translations of those exhibits include an "A" next to the exhibit number.

Alliance . . . and sharing with Alliance very sensitive pricing information relating to the purchase of magnesium scrap and responding to other requests, such as a financial model that Alliance could use." (Ex. 4 at 2).   The AMACOR Letter advised Alliance to "take all steps necessary to identify, retain, and preserve all data in your possession or under your control, including electronic data, that pertains [to] the matters referenced in this letter." (*Id.* at 3).

Alliance's counsel responded to the AMACOR Letter on June 12, 2020, stating, in relevant part:

> Amacor should rest assured that Mr. Dery is not working for nor associated with Alliance.  There will be no collaboration between our client and Mr. Dery until this matter has been duly investigated.  Moreover, Alliance will cancelled [sic] the previous employment offer and we will advise you prior to making Mr. Dery any further offers of this nature.

(Ex. 10 at 2).

After this lawsuit was filed on August 27, 2020, the parties negotiated an Agreed Standstill Order and an Agreed Injunction, which were entered by the court on September 4, 2020, and October 27, 2020, respectively.  The Agreed Standstill Order provided, in relevant part:

> 1. *Dery and Alliance, and each of them, and those acting in concert or participation with them, are hereby temporarily enjoined and restrained from participating, directly or indirectly, or assisting any third party, directly or indirectly, in the manufacture, sale, solicitation of orders, acceptance of business, or negotiation of contracts for potential sales of recycled magnesium.* Nothing herein; (a) prohibits Alliance from building a processing facility, so long as it does not manufacture, sell, solicit orders, accept business, or negotiate contracts for potential sales of recycled magnesium during the term of this Agreed Order; and (b) prohibits Alliance from engaging in the primary magnesium market and any other market. However, *Dery is prohibited from working in any capacity for Alliance or in*

4

*the magnesium industry during the term of this Order*; provided that nothing in this Order prohibits Dery from engaging in businesses involving other chemical elements, materials or substances.

(Filing No. 28. at 1) (emphasis added).

The Agreed Injunction provided, in relevant part:

1. *Alliance and those acting in concert or participation with it are hereby enjoined and restrained from (i) participating, directly or indirectly, or assisting any third party, directly or indirectly, in the manufacture, sale, solicitation of orders, acceptance of business, or negotiation of contracts for potential sales of recycled magnesium through December 31, 2020, and (ii) employing or using the services of Dery, whether directly or indirectly, through trial in this matter.* Nothing herein: (a) prohibits Alliance from building a processing facility, so long as it does not manufacture, sell, solicit orders, accept business, or negotiate contracts for potential sales of recycled magnesium through December 31, 2020; and (b) prohibits Alliance from engaging in the primary magnesium market and any other market.

2. *Through June 8, 2022, Dery is enjoined and restrained from working in any capacity in the magnesium industry*; provided that nothing in this Order prohibits Dery from engaging in businesses involving other chemical elements, materials or substances.

\*\*\*

5. This Order supersedes the Agreed Standstill Order entered by this court on September 4, 2020.

(Filing No. 59 at 1-2) (emphasis added).

In its Renewed Motion to Hold Defendants and Alliance Principals Joel Fournier and Michel Gagnon in Contempt of Court, AMACOR alleges Alliance, Dery, Fournier, and Gagnon violated the Orders by secretly employing Dery, through a Chinese intermediary called Power Up China, to source magnesium scrap. AMACOR further

alleges that Alliance and Alliance's U.S. distributor, Wogen Resources America, LLC,[3] violated the orders by soliciting sales of secondary magnesium during the injunction period.

This motion, as well as AMACOR's motion for sanctions for spoliation, was referred to the Magistrate Judge, who held a four-day evidentiary hearing on July 12, 13, 14, and 31, and closing arguments on August 3, 2023.  At the hearing, over 100 exhibits were admitted, and seven witnesses testified[4]—Edward Hopkins, Michel Gagnon, Alain Dery, Joel Fournier, and Claude Delage, Remi Belliveau, and Gervais Jacques.

In a thorough and well-reasoned opinion, the Magistrate Judge had "no difficulty concluding that AMACOR ha[d] established by clear and convincing evidence that Alliance/Tergeo, Gagnon, Fournier, and Dery violated the Orders by continuing to use Dery to assist Alliance in the magnesium industry after the Orders were entered," even going so far as to conclude that they "never intended to comply with the Orders."  (Filing No. 737 at 25).  Indeed, he found that in July 2020, prior to agreeing to the entry of the Orders, Alliance, through Gagnon and Fournier, implemented a plan by which Dery would secretly work for Alliance through a Chinese company called Power Up China. Alliance would pay Power Up China $18,000.00 per month, a 3.5 percent administrative fee ($630.00), and 6.5 percent sales tax ($1,170.00), for a total of $19,800.00 USD. (Filing No. 737 at 9–10).  Power Up China would then pay Dery, through his consulting

---

[3] Wogen was added as a party to this action on December 1, 2021.  (Filing No. 195).
[4] Testimony from the transcript is set forth in Filing Nos. 702, 703, 704, and 723.  Designations from the depositions of Gervais Jacques and Remi Belliveau are set forth in Exhibits 107 and 108, respectively.

company, Moresco Enterprises, Inc., $18,000.00 USD per month.  (*Id.* at 10).  This payment arrangement continued for about a year.  (*Id.* at 12).

In addition to payments, the Magistrate Judge also found that Alliance, Fournier, and Gagnon routed communications to Dery through Power Up China and others.  To avoid detection after this litigation began, Fournier instructed Alliance Plant Manager Remi Belliveau not to contact Dery directly.  (*Id.* at 18).  If Belliveau needed to contact Dery, he was to go through Power Up China's owner, Jean Deragon, and later, Fournier. (*Id.*).  Belliveau was also instructed to refer to Dery as "Mr. X."  (*Id.* at 18–19).  Consistent with Belliveau's testimony, on September 8, 2020, Alliance's engineering company, Seneca, emailed a question about a piece of equipment to Belliveau, asking if "Mr. X" could help.  (*Id.* at 19, citing Ex. 36A).  Belliveau then forwarded the email to Deragon.  (*Id.*, citing Ex. 40A).

Dery also directed Alliance to contact him through new email addresses that did not include his last name.  (*Id.* at 20).  On June 9, 2020, the day after his termination, Dery provided Gagnon with a new email address to be used for all future communications—deaj2566@gmail.com.  (*Id.*).  On June 12, 2020, Gagnon contacted Deragon with a "message from Alain," asking him to email Dery at deal722223@gmail.com.  (*Id.*).  Dery used yet another email account, daj427@videotron.ca, to communicate with Alliance and Deragon in 2020.  (*Id.*).  The Magistrate Judge concluded that "these new email addresses were created and used with the hope that emails to and from those addresses would not have to be turned over in discovery because they would not turn up when Dery's name was searched."  (*Id.* at 20).

Dery even purchased a Motorola phone—registered in the name of his then-wife—which he purchased primarily to communicate with Alliance, Deragon, and Gagnon's wife, Caroline Verreault, between July and November 2020.  (*Id.* at 20). Verreault, who had never met Dery, relayed messages between Dery and Gagnon with her work-issued cell phone.  (*Id.* at 21–22).  The Magistrate Judge noted that "[t]he communications between Dery and Verreault's phone were not preserved by Alliance and their existence was not disclosed by Alliance/Tergeo in discovery until 2022."  (*Id.* at 22).[5]

The Magistrate Judge further found, by clear and convincing evidence, that Alliance's discussions with multinational technology company, Apple, Inc., violated the Orders.  (*Id.* at 26).  The evidence in support of this finding was contained in Exhibits 59 and 60, in which Gagnon informed Jim Yurko of Apple that Alliance's recycling facility should be up and running in April 2021; therefore "producing quality ingots with your alloy by August 2021 should be realistic." (Ex. 60 at 1–2).

With respect to Wogen, the Magistrate Judge concluded that Wogen's actions did not constitute a "significant violation of the Orders."  (*Id.* at 30).  This was because "the evidence shows only very general discussions of secondary magnesium by Wogen [which] can reasonably be characterized as acknowledgement that future sales would be

---

[5] In response to counsel's question asking why he [Gagnon] did not look for text messages from his wife's phone until sometime after May 2022, he responded: "I did not receive the text messages so I – there was no way for me to know."  (Filing No. 703 at 31).  The Magistrate Judge found this testimony "not credible."  (Filing No. 737 at 22).

possible rather than solicitations or negotiations." (*Id.* at 30).  And although Wogen knew Dery was assisting Alliance before entry of the Orders, the Magistrate Judge found no evidence that Wogen knew Dery was assisting Alliance after entry of the Orders. (*Id.* at 30–31).

## II.   Standard of Review

"[R]esolution of a sanctions request is a dispositive matter capable of being referred to a magistrate judge only under [28 U.S.C.] § 636(b)(1)(B) or § 636(b)(3)." *Retired Chi. Police Ass'n v. City of Chicago*, 76 F.3d 856, 869 (7th Cir. 1996). Consequently, "the district judge must review the magistrate judge's report and recommendation *de novo*." *Id.*; Fed. Rule Civ. P. 72(b) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to.").  "But this *de novo determination* is not the same as a *de novo hearing*." *Goffman v. Gross*, 59 F.3d 668, 671 (7th Cir. 1995) (emphasis in original).  In other words, the magistrate judge's credibility findings based on a witness's live testimony may not be disturbed.  *Id.* ("The district court is not required to conduct another hearing to review the magistrate judge's findings or credibility determinations.") (citing *United States v. Raddatz*, 447 U.S. 667, 675 (1980)); *see also Jackson v. United States*, 859 F.3d 495, 498–99 (7th Cir. 2017) (holding that a district court may not reject a magistrate judge's credibility findings based on a witness's live testimony without first holding a *de novo* evidentiary hearing).  The district court may accept, reject, or modify the magistrate's recommendations, receive further evidence, or remand the matter to the

magistrate judge with instructions. *Goffman*, 59 F.3d at 671 (citing 28 U.S.C. § 636 (b)(1), Fed. R. Civ. P. 72(b)).

## III.   Applicable Law

As the movant in a motion for contempt, AMACOR has the burden of proving, by clear and convincing evidence, that:

> (1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply.

*S.E.C. v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010). Clear and convincing evidence is evidence that places "in the ultimate fact-finder an abiding conviction that the truth of . . . [the] factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).

## IV.   The Objections

Alliance and Gagnon raise four objections. First, they argue AMACOR did not prove by clear and convincing evidence that Alliance and Gagnon employed or used the services of Dery *after* the court's Orders. Second, they argue AMACOR did not prove by clear and convincing evidence that Alliance and Gagnon violated the solicitation prohibitions contained in the court's Orders. Third, they argue a civil contempt recommendation is not appropriate because there is nothing left to coerce and AMACOR has not sustained any losses because of the alleged contempt. Lastly, they argue the R&R's referral for criminal prosecution is not warranted. As explained in footnote 1, Dery joins in Alliance and Gagnon's objections.

10

Fournier raises three objections.  First, he argues there is no definitive evidence that Fournier's instruction—that Belliveau go through Deragon and Fournier to contact Dery—continued *after* the court Orders.  Second, he argues there is no evidence that Fournier continued to work with Dery after entry of the Orders.  Lastly, he argues the Magistrate Judge exceeded the scope of his referral by recommending criminal prosecution.  Dery joins in Fournier's objections.

AMACOR raises one objection in its motion for additional sanctions.  It argues the Magistrate Judge's factual finding that Wogen's contacts with its customers, Arconic and Hydro Extrusion, did not constitute a "significant" violation of the Orders was erroneous.

The court will first discuss Alliance and Gagnon's objections and Fournier's objections.  Their objections to the referral for criminal prosecution will be addressed in the section regarding AMACOR's motion for additional sanctions.

### A.     Alliance & Gagnon's Objection 1

Alliance and Gagnon admit that they had a plan in place in which Dery would perform magnesium scrap sourcing and other work for Alliance through Power Up China.[6]  (Filing No. 741 at 8; Filing No. 310 at 9).  They argue, however, that there is no evidence that Alliance employed or used the services of Dery indirectly through Power Up China *after* the court Orders—i.e., September 4, 2020.  The court disagrees.  The evidence reflects the following:

---

[6] Despite this admission, Dery testified that he "did not understand that Power Up China was paid by Alliance to pay [him]."  (Filing No. 704 at 47).  "What [he] understood was that Power Up China hired [him] to do consultant work for them and that they would pay [him]."  (*Id.*).

- Gagnon and Fournier placed Dery at Power Up China after Alliance assured AMACOR there would be "no collaboration" between it and Dery  (Filing No. 702 at 150, 152–53; Ex. 10 at 2).

- After AMACOR filed its Complaint on August 27, 2020—and while the parties were finalizing negotiations on the language of the Standstill Order—Fournier reported the arrangement to Edward Hopkins of Wogen.  (Ex. 33; Filing No. 702 at 29-30).

- Payments from Alliance to Power Up China, which were then relayed to Dery, were approximately the same amount ($18,000 USD per month) he would have been paid under Dery's employment agreement with Alliance.  (*Compare* Ex. 2A, *with* Filing No. 702 at 150–55).  Evidence confirms that Dery was working to source magnesium scrap for Alliance at that time.  (Exs. 28A, 29A & 30A).

- There is no reasonable explanation why Alliance continued to route those exact payments to Dery via Power Up China through July 2021—long after the court entered its Orders.[7]  (Filing No. 703 at 266-67; Filing No. 704 at 47; Ex. 74).

---

[7] Gagnon testified he did not know Alliance's monthly $18,0000 payments continued to go to Dery after the court entered the Standstill Order.  (Filing No. 702 at 162 ("Q: You know that after the standstill order, Power Up China continued to keep $630 per month of what Alliance paid it, right? A: No, not at that time.  Honestly, we never thought that that was transferred to Mr. Dery, the same—the same amount.  Q: You know it now, right?  A: We found out about it through depositions in autumn 2021."; *see also id.* at 164 ("Q: You know now that during these three months, August, September, October [2020], that Power Up China set up your scrap procurement operation, Alain Dery was receiving $18,000 per month routed from Alliance to Power Up China, right?  A: Now I know it.  Since we found out in deposition.")).

- Gagnon and Fournier testified that the $18,000 monthly payments were for Power Up China's equipment sourcing services. (Filing No. 703 at 13 (Gagnon testifying Alliance's monthly payments to Power Up China after the court Orders were for equipment procurement and sourcing services that Power Up China provided); Filing No. 723 at 195 (Fournier: "[Deragon of Power Up China] said, I am not going to keep giving you quotes ad nauseum unless you buy something.")). Prior to the arrangement with Dery, however, Power Up China sourced equipment for Alliance without a monthly payment. (*See, e.g.*, Ex. 25 (July 2020 bid proposal from Power Up China's owner, Jean Deragon, for a piece of equipment)). The idea that, after the court entered the Orders, those exact payments were not meant for Dery but for Power Up China's services, is not, as the Magistrate Judge observed, believable. It is also worth noting that, according to Gagnon, Alliance did not purchase the equipment he says Power Up China sourced during this time, further showing that the invoices were for Dery's—not Power Up China's—efforts. (Filing No. 703 at 76–77).

- Contrary to Alliance's suggestion, the fact that Alliance continued to pay Power Up China $18,000 a month until December 2021, (Filing No. 703 at 21)—about six months after Power Up China's payments to Dery ended—is not persuasive evidence that Alliance's payments to Power Up China were unrelated to Power Up China's payments to Dery. As the Magistrate found, once Wogen produced the email that revealed Alliance's arrangement with Power Up China (Ex. 33) on July 26, 2021, (Filing No. 704 at 4–5), it would have been too suspicious for Gagnon,

13

Fournier, and Deragon to simultaneously stop the corresponding payments,[8]
(Filing Nol. 737 at 17–18).

- Despite Alliance's assertion that Dery's work at Power Up China had nothing to do
  with Alliance following entry of the Standstill Order, there is no reasonable
  explanation why Alliance and Dery continued to communicate through Power Up
  China, Gagnon's wife, and Dery's secret Motorola phone following the Standstill
  Order.  (Ex. 93 at 21; Ex. 36A; Ex. 40A).

- There are no documents showing that Alliance instructed Dery or Power Up China
  to stop working together for Alliance's benefit.  (Filing No. 702 at 164).

- The description of the work performed on Dery's invoices to Power Up China both
  before and after the Standstill Order did not change.  Dery's August 2020 invoice
  stated it was for a "semi [sic] finished" aluminum project.  (Ex. 15A; Ex. 17).
  Dery's September, October, November, and December 2020 invoices are identical
  to the August 2020 invoice.  (Ex. 17).  Later invoices submitted by Dery stated
  they were for work on a "carbon blocks" project.  (*Id.*; Ex. 74).

- Dery testified he worked approximately 30 hours per week over the course of 13
  months doing consulting work for Power Up China, for which he was paid
  $198,000 USD.  (Filing No. 704 at 50–51, 56).  Yet, except for the invoices Dery
  submitted, there are no documents to substantiate any consulting work he

---

[8] The production of the Wogen email may also explain why Dery did not seek payment from
Power Up China for his July and August 2021 invoices.  (Filing No. 723 at 100).

performed for Power Up China.  (Filing No. 704 at 50–54; *id.* at 56 (Dery: "The nature of the work with Power Up China was that we would discuss ideas and concepts face-to-face, and I didn't have any documents.")).  There are no documents related to his work on the semi-finished aluminum project or the carbon blocks project.  (*Id.* at 51).  There are no documents reflecting any project assignments from Deragon to Dery, and no documents memorializing any meetings Dery had with Deragon.  (*Id.* at 52–53).

- After AMACOR filed this lawsuit, Belliveau testified that Fournier told him that he needed to go through Deragon and Power Up China to reach Dery.  (Filing No. 108 at 3-4).  Belliveau did so on one occasion.  (*Id.* at 4).  That testimony is supported by emails showing Belliveau reached out to Deragon *after* entry of the Standstill Order regarding a question from Alliance's engineer seeking "Mr. X's" assistance regarding a piece of equipment.  (Exs. 36(a) & 40(a)).

Alliance makes much of the fact that there is no "smoking gun" evidence explicitly referencing Dery's work for Alliance after September 4, 2020.  This is not surprising given the lengths Gagnon, Fournier, and Dery took to conceal their communications.  Moreover, as detailed in the court's Entry on Dery and Alliance's objections to the Report and Recommendation regarding AMACOR's Motion for Sanctions for Spoliation, much of the evidence of communications between Alliance and Dery were destroyed.  Dery's Motorola phone mysteriously disappeared at a Chinese restaurant in Montreal shortly before Dery was to hand it over for forensic examination in March 2021.  (Filing No. 723 at 7).  Dery "assumed that all of the information on [the phone] was backed up," but it

was not.  (*Id.* at 14–15).  Verreault's (Gagnon's wife) work-issued cell phone, through

which Gagnon and Dery exchanged messages, also broke sometime in 2021, and all texts

and call records were destroyed.  (Filing No. 702 at 185).  And Dery did not preserve the

emails in his accounts because he "just thought that e-mails always stayed in the account,

for forever."  (Filing No. 723 at 31; *see also id.* at 31 (Dery: "As I said, I thought all e-

mails in an account stayed in the account.")).

Finally, Alliance and Gagnon object that the Magistrate Judge improperly shifted

the burden upon them to establish that the pre-lawsuit collaboration between Alliance and

Dery ceased when the court issued the Standstill Order on September 4, 2020.  The court

is not persuaded.  As shown above, clear and convincing evidence reflects that the pre-

lawsuit collaboration between Alliance and Dery continued *after* the Standstill Order.

Therefore, Alliance and Gagnon's first objection is **OVERRULED**.

### B.    Alliance & Gagnon's Objection 2

Alliance and Gagnon object to the Magistrate Judge's finding that its discussions

with Apple violated the Orders' unambiguous command that Alliance was enjoined from

"participating, directly or indirectly . . . in the . . . solicitation of orders . . . or negotiation

of contracts for potential sales of recycled magnesium" through December 31, 2020.

(Filing No. 28 at 1; Filing No. 59 at 1).  They argue the term "solicitation of orders" is

ambiguous, and at any rate, Alliance could not as a practical matter sell recycled

magnesium because its processing facility was not up and running in 2020.

As background, Gervais Jacques was an Alliance board member from April 2020

to March 2022.  (Ex. 107 at 1).  He had industry contacts with companies that could

potentially purchase magnesium, including Apple.  (*Id.* at 2).  In that regard, Jacques

contacted Apple's strategic project manager, Jim Yurko.  (*Id.* at 3).  After Gagnon and

Yurko signed a nondisclosure agreement in October 2020, (Ex. 46), the parties—Gagnon,

Fournier, Jacques, and Yurko—began discussing potential sales of primary magnesium,

specifically, alloy ZK60, (Filing No. 107 at 7; Ex. 51).  Gagnon informed Yurko that

Alliance "will be able to produce ZK60 after start-up of our primary section which should

happen in Q4 2021," but he also explained that they could "discuss a plan B if you need it

before Q4."  (Ex. 51).  Yurko asked what the timeline would be for producing ZK60.

Gagnon responded: "We will start our recycling facility in April 2021[;] therefore

producing quality ingots with your alloy by August 2021 should be realistic."  (Ex. 60 at

1–2).  Jacques testified: "We were trying to establish a relationship with Apple, and we

were striving to do so while we were waiting and *while using secondary*."  (Filing No.

107 at 7) (emphasis added).  A relationship with Apple was important to Alliance

because, as Jacques explained, "Apple is an iconic client, and [Gagnon] was trying by all

means to do business with Apple."  (*Id.* at 8).

Contrary to Alliance's argument, the term "solicitation of orders" is not

ambiguous.  The term includes "not just explicit verbal requests for orders, but also any

speech or conduct that implicitly *invites* an order."  *Wis. Dep't of Rev. v. William Wrigley,

Jr., Co.*, 505 U.S. 214, 223 (1992); *see also Enhanced Network Sols. Grp., Inc. v.

Hypersonic Techs. Corp.*, 951 N.E.2d 265, 268 (Ind. Ct. App. 2011) (defining solicitation

as "[t]he act or an instance of requesting or seeking to obtain something; a request or

petition") (citation omitted)).  Further, a sale does not have to take place to fall within the

definition; a verbal request for an order is sufficient.  Accordingly, the court finds AMACOR has established by clear and convincing evidence that Alliance "solicited" sales with Apple for recycled magnesium in October and November 2020, and thus violated the anti-solicitation provisions of the Orders.  This violation was significant, as Apple was an "iconic client" and could, as the Magistrate Judge noted, bring in not only business but also establish Alliance's reputation in the industry.  (Filing No. 737 at 26). Alliance and Gagnon's second objection is **OVERRULED**.

### C.   Alliance & Gagnon's Objection 3

Alliance and Gagnon argue the Magistrate Judge's civil contempt recommendation is not appropriate.  To understand their argument, the court starts with the law on civil contempt.

Relief for civil contempt is either coercive or remedial.  *Lightspeed Media Corp. v. Smith*, 830 F.3d 500, 508 (7th Cir. 2016).  It is "designed either to compel the contemnor into compliance with an existing court order or to compensate the complainant for losses sustained as a result of the contumacy."  *Id.* (quoting *United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2016)).  Alliance and Gagnon argue that because they have stopped their association with Dery and because the Orders' prohibition on sales solicitation has expired, there is nothing left to coerce.  They also argue that because AMACOR suffered no losses as a result of their conduct, "[t]here can be no civil contempt."  (Filing No. 741 at 34).  The court rejects Alliance's arguments.  The R&R's recommended award to AMACOR of its attorneys' fees for the briefing of the original and renewed motion for contempt, all discovery related to those motions, the preparation for the hearing on the

renewed motion, and the preparation and litigation of its fee motion is remedial and warranted.  Alliance and Gagnon's third objection is **OVERRULED**.

   **D.     Fournier's Objection 1**

   Fournier's first objection centers around Belliveau's testimony that Fournier instructed him to go through Deragon to contact Dery "because it will be simpler than to hire him directly."  (Ex. 108 at 4).  Fournier maintains there is no evidence in the record when that conversation occurred and thus, no evidence that this instruction continued after the entry of the Standstill Order.

   Fournier's argument ignores Belliveau's testimony that this conversation occurred after AMACOR filed the lawsuit on August 27, 2020.  (*Id*. at 10).  The Standstill Order was entered on September 4, 2020, only eight days later.  (Filing No. 28).  Belliveau also testified that Fournier later told him to go through him [Fournier] instead of Deragon if he wanted to contact Dery.  (Ex. 108 at 5).  It is highly unlikely that those instructions would have only been in effect between August 27 and September 4, 2020.  Further, as the Magistrate Judge noted, Belliveau did not testify that he was ever instructed by Fournier *to stop* seeking Dery's assistance.  (Filing No. 737 at 19).  Indeed, Belliveau testified that [Fournier and Gagnon] never informed [him] not to speak with [Dery]." (Filing No. 108 at 7).

   The Magistrate Judge also pointed to emails showing Belliveau continued to follow Fournier's instructions after September 4, 2020.  In an email dated September 8, 2020, Cyril Trincat of Seneca, Alliance's engineering consulting firm, asked Belliveau if "Mr. X" could help with a technical issue.  (Ex. 36A).  Belliveau forwarded the email to

Fournier the next day.  (*Id.*).  A week later, Belliveau forwarded the same email to Deragon, asking Deragon to call him about it.  (Ex. 40A at 1).  Fournier argues these emails do not show any impropriety on his part, as nothing in the emails shows he encouraged the communication or responded to the email.  But as the Magistrate Judge observed, Belliveau's forwarded message to Deragon shows that Belliveau still believed it was appropriate to seek Dery's assistance through Deragon after the entry of the Standstill Order.

It is also worth noting that Edward Hopkins' email to his Wogen superiors recounting what Fournier had told him about not using Dery's services directly but through an intermediary, Power Up China, was sent only days before the court's entry of the Standstill Order.  (Ex. 33).  Fournier's argument that none of this was enough to demonstrate that the described plan was carried out after the entry of the Standstill Order on September 4, 2020, is not worthy of credence.  Fournier's first objection is **OVERRULED**.

### E.      Fournier's Objection 2

Next, Fournier argues there is no evidence showing he continued to work with Dery after the entry of the Standstill Order.  The court disagrees; clear and convincing evidence show otherwise.  *See* Section IV.A.

Fournier also maintains the only evidence cited by the Magistrate Judge to establish his continued affiliation with Dery after the Standstill Order is Exhibit 36A, the "Mr. X" email, and this email proves nothing because he did not respond to it.  This

argument is rejected for the reason just stated.  Fournier's second objection is

**OVERRULED**.

> **F.    AMACOR's Objection**

Finally, AMACOR objects to the Magistrate Judge's recommendation to deny

AMACOR's motion for contempt as to Wogen.  In arriving at his recommendation, the

Magistrate Judge considered the testimony of Hopkins as well as email communications

between Wogen and two of its customers, Arconic and Hydro Extrusion.  He concluded

that based upon that evidence, he could "not find that Wogen's actions constituted a

significant violation of the Orders [because] [t]he evidence before the Court shows only

very general discussions of secondary magnesium by Wogen."  (Filing No. 737 at 30).

Those discussions, he concluded, "can reasonably be characterized as an

acknowledgement that future sales would be possible rather than solicitations or

negotiations."  (*Id.*).

The court begins with Arconic.  On August 17, 2020, Benjamin Franck of

Arconic reached out to Laura Bell of Wogen to introduce a new Arconic hire, Erin

Murray.  (Ex. 34 at 2).  Murray was hired to take over responsibility for Arconic's

purchase of metals globally.  (*Id.*).  Bell responded to Murray and Franck, stating in part:

> Hopefully we will continue to have the opportunity to work together on the
> US side of things with the Alliance material.  Things are progressing very
> well with the project.  They are fully funded now and construction of the
> plant is well under way.  The first secondary Mg units are expected Q1 2021
> with primary units following Q3.  [Hopkins] and I will send some further
> details on this separately.

(*Id.* at 1).  On September 7, 2020, Bell emailed Murray, asking to set up a call with her. (*Id.*).  She noted that "[w]e are the exclusive distributors for the new Alliance Magnesium project in Canada[,] so we hope to be able to work with you more closely for your US plants in the coming months as well." (*Id.*).  After an apparent phone call on September 10, 2020, Murray expressed interest in Alliance's "Green" magnesium, to which Hopkins responded that Wogen "look[ed] forward to providing samples for the secondary and primary Mg as they become available next year[.]" (*Id.*).  Hopkins testified that he was unaware of the Standstill Order at that time.  (Filing No. 702 at 60).

Communications with Hydro Extrusion occurred on October 14, 2020.  Hopkins emailed Michael Mummey, a Metal Procurement Specialist at Hydro, asking for "a few minutes of [his] time" to discuss Hydro's metal needs.  (Ex. 48).  Hopkins informed Mummey that "Wogen will be the US representative for the new Alliance Magnesium primary and recycled Mg plant now being built in Eastern Canada that will begin production in 2021" and offered to "give [him] an update on the Alliance Mag product and their expected production timetables." (*Id.*).  A few hours after this email communication, Bell from Wogen sent an email to Hopkins and the Wogen board informing them of a conversation she had with Alliance over the instant litigation.  (Ex. 47).  She said: "The upshot is that we still can't really go out there and promote the project and lay the groundwork for first production in Mar/Apr until the injunction is lifted which is a frustration." (*Id.*).

The court agrees with the Magistrate Judge that the totality of the evidence counsels against a finding of civil contempt against Wogen.  First, it is not clear when

Wogen learned of the Orders.  Second, to the extent Wogen knew of the Orders when it reached out to Arconic and Hydro Extrusion, its conversations were not "solicitations of orders," nor can they be construed as "negotiations of contracts for potential sales of," recycled magnesium within the meaning of those Orders.  They were akin to establishing business contacts for possible future orders for secondary magnesium.  AMACOR's objection is **OVERRULED**.

## V.   AMACOR's Motion for the Court to Exercise its Inherent Authority to Issue Additional Sanctions[9]

In its brief in support of the renewed motion for sanctions, AMACOR seeks the following remedies:

1. entry of default judgment in favor of AMACOR and against Defendants;

2. extension of all terms of the Standstill Order and Agreed Injunction for a period of twelve months from the date of the resolution of the instant motion, including, but not limited to, the prohibitions against working with Dery, using AMACOR's trade secrets and confidential information, and "participating, directly or indirectly, or assisting any third party, directly or indirectly, in the manufacture, sale, solicitation of orders, acceptance of business, or negotiation of contracts for potential sales of recycled magnesium," and including a specific prohibition against Alliance/Tergeo transacting business with Power Up China, Heneken, or any other entity at which Dery is employed or with which Dery is affiliated;

---

[9] Dery joins in Alliance's response to this motion.  (Filing No. 758).

3. an order that Defendants Alliance/Tergeo, Gagnon, and Fournier, jointly and

severally, must disgorge the sum of $216,000.00,[10] and any compensation that Dery has

received at Heneken,[11] plus interest, and pay the sum to AMACOR;

4. an order that Defendants, Gagnon, and Fournier, jointly and severally, must pay

AMACOR's attorneys' fees and costs related to the investigation, preparation, and

prosecution of this Renewed Motion for Contempt and AMACOR's initial Motion, which

was withdrawn upon discovery of new violations; and

5. all other just and appropriate relief.

(Filing No. 445 at 59).

The Magistrate Judge found that none of the remedies AMACOR seeks, except for

an award for attorneys' fees and costs, are appropriate civil contempt remedies for this

case. (Filing No. 737 at 31–37). He further found that an award of fees and costs is not

sufficient to punish Alliance, Gagnon, Fournier, and Dery for their willful violations of

the Orders. (*Id.* at 37). He therefore found that a referral for criminal contempt

proceedings was warranted.

Acknowledging that "the Court has authority to issue sanctions pursuant to its

inherent authority for violations of its Orders," the Magistrate Judge left open the

possibility of the court imposing additional sanctions, including default judgment. (*Id.* at

---

[10] At closing argument, AMACOR requested $234,000 from Dery, (Filing No. 727 at 18), and "an appropriate percentage of [Gagnon's and Fournier's] last year's salaries, while they were violating the Court's orders," (*id.* at 34).

[11] Dery began working for Heneken in May 2022. (Filing No. 723 at 35). The Magistrate Judge found Dery's work for Heneken did not violate the Agreed Injunction, which expired in June 2022. (Filing No. 737 at 5 n.5).

35 n. 37).  Seizing on that opportunity, AMACOR filed the present motion for additional sanctions pursuant to the court's inherent authority.  The additional sanctions it seeks include an extension of the Agreed Injunction, default judgment, and/or disgorgement of the "ill-gotten gains" of Alliance, Dery, Gagnon, and Fournier.

The court agrees with the Magistrate Judge that Alliance, Dery, Gagnon, and Fournier should be held jointly and severally to AMACOR for its attorneys' fees and costs associated with the briefing of the original motion for contempt, the briefing of the renewed motion for contempt, all discovery related to those motions, the preparation for and participation in the evidentiary hearing held in July and August 2023, and the preparation and litigation of its fee motion.  It also agrees that an extension of the Agreed Injunction and/or disgorgement of Dery's, Gagnon's, and Fournier's salaries is not an appropriate sanction.  But the court finds that referral for criminal contempt proceedings is not warranted.  It was not a specific remedy sought in AMACOR's renewed motion, and it was not argued at the evidentiary hearing.  Instead, for the reasons explained below, the court finds default judgment against Defendants Dery and Alliance pursuant to the court's inherent authority is the more appropriate sanction.

"A district court may impose sanctions pursuant to its inherent authority 'where a party has willfully abused the judicial process or otherwise conducted litigation in bad faith.'" *Fuery v. City of Chicago*, 900 F.3d 450, 463 (7th Cir. 2018) (quoting *Tucker v. Williams*, 682 F.3d 654, 661–62 (7th Cir. 2012)).  The court's inherent power to sanction misconduct includes the power to enter a default judgment against the offending party. *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 779 (7th Cir. 2016);  *Alexander v. Casino*

25

*Queen Inc.*, 321 F. App'x 509, 511 (7th Cir. 2009) ("District courts have the power to control their dockets, and there comes a point when disregard of court rules and orders becomes so serious that sanctions, including dismissing a case [or entering a default judgment] *sua sponte,* are in order.").  "The sanction of dismissal [or default judgment] is appropriate only in extreme situations when there is a clear record of delay or contumacious conduct, or when other less drastic sanctions have proven unavailing." *English v. Cowell,* 969 F.2d 465, 473 (7th Cir. 1992) (citations and internal quotation marks omitted); *see Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 811 (7th Cir. 2007) ("[A] default judgment should be used only in extreme situations, or when other less drastic sanctions have proven unavailing.").

The court finds that default judgment is an appropriate remedy against Defendants Dery and Alliance.  Their deliberate violations of the court's Orders, the extensive measures they took to cover up their misconduct, including routing payments to Dery through a foreign entity and use of codenames and initials to conceal Dery's identity, their intentional spoliation of evidence (as detailed by separate entry), and their untruthful and misleading testimony warrant this extraordinary sanction.  AMACOR's motion for additional sanctions is therefore **GRANTED in part** and **DENIED in part**.

## VI.    Conclusion

The court now rules as follows:

(1)    AMACOR's Renewed Motion to Hold All Defendants and Alliance Principals Michel Gagnon and Joel Fournier in Contempt of Court (Filing No. 443) is **GRANTED** as to Defendants Alliance Magnesium Inc., now d/b/a Tergeo Critical Minerals Inc.,

Michel Gagnon, Joel Fournier, and Alain Dery, and **DENIED** as to Defendant Wogen

Resources America LLC.

(2)   The Objection filed by Alliance and Michel Gagnon (Filing No. 741) is

**SUSTAINED in part** and **OVERRULED in part**;

(3)   The Objection filed by Joel Fournier (Filing No. 743) is **SUSTAINED in part** and

**OVERRULED in part**; and

(4)   AMACOR's Motion for the Court to Exercise its Inherent Authority to Issue

Additional Sanctions, or Alternatively Limited Objections Thereto (Filing No. 746) is

**GRANTED in part** and **DENIED in part**.

The court enters **DEFAULT JUDGMENT** in favor of Plaintiff AMACOR and

against Defendants Alliance Magnesium Inc., now d/b/a Tergeo Critical Minerals Inc.,

and Alain Dery.

The court **AWARDS** AMACOR its attorneys' fees and costs associated with the

briefing of the original motion for contempt, the briefing of the renewed motion for

contempt, all discovery related to those motions, the preparation for and participation in

the evidentiary hearing on the renewed motion for contempt, and the preparation and

litigation of its fee motion.  Alliance, Gagnon, Fournier, and Dery are jointly and

severally liable for the fees and costs awarded.

The parties are **ORDERED** to confer and make a reasonable attempt to agree on

an appropriate fee award and are **FURTHER ORDERED** to report to the court whether

those efforts were successful by **March 1, 2024**.


**SO ORDERED** this 23rd day of January 2024.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.